Commonwealth of Pennsylvania *v.* Bryan Webb.

Argued November 16, 1970, before President Judge
BOWMAN and Judges KRAMER, MANDERINO, MENCER,
and BARBIERI (who has since been appointed to the
Supreme Court of Pennsylvania and did not participate

in the decision). Judge WILKINSON, JR. disqualified himself and withdrew.

*Louis W. Fryman,* with him *Edward R. Becker, Becker, Becker & Fryman,* for appellant.

*Joseph P. Work,* General Counsel, State Horse Racing Commission, for appellee.

OPINION BY JUDGE MENCER, filed February 1, 1971:

Bryan Webb, who has been a professional trainer of thoroughbred race horses for sixteen years, who has been licensed to train such horses in numerous states of this country, and who has in the past five years been rated as one of the top twenty trainers in America, was suspended for thirty days by the Stewards of the Continental Meeting, Liberty Bell Park, Philadelphia, Pennsylvania, on June 19, 1969, for "failing to protect his horse" in violation of Rules 15.02 and 15.06 of the Rules of Racing promulgated by the Pennsylvania State Horse Racing Commission.[1]

---

[1] 15.02 Should the chemical analysis of any sample taken from a horse entered in a race indicate the presence of any forbidden narcotic, stimulant, depressant, local anesthetic or analgesic, the trainer of the horse, together with the assistant trainer, stable foreman, groom, or any other person shown to have had care and attendance of the horse shall be subject to disciplinary action as set forth in Rule 16.46, and such horse shall be declared unplaced for every purpose except pari-mutuel wagering which shall in no way be affected.

15.06 The owner, trainer, groom or any other person who is charged with the custody, care and responsibility of the horse, are

This action followed a positive result from a chemical analysis of the urine of a horse, Vertical Spin, under Webb's auspices, after the horse placed first in the ninth race at Liberty Bell Park on June 12, 1969. Out of a quantity of 200 ml of urine, 6.2 mg of the drug Butazolidin IV, or Phenylbutazone, was recovered. This drug is commonly used in the treatment of ailing race horses to combat arthritic disorders, to relieve pain, and to reduce inflammation and fever.

In addition to Webb's suspension, and for its duration, Vertical Spin and 34 other horses under Webb's care were suspended and denied entry to the track grounds until their transfer or sale was approved by the Stewards of the Continental Meeting. Also, Vertical Spin was denied the first place purse and the monies were redistributed to the next five finishers in the race, although the pari-mutuel wagering on the race was unaffected.

It is important to note that Webb, represented by counsel, was given on June 18, 1969, a hearing before all three Stewards before any public announcement concerning the positive urinalysis was made. This was in accordance with part (e) of Rule 16.46 of the Rules of Racing which, in several pertinent parts, is set forth below.[2]

---

all obligated to protect and guard the horse against the administration or attempted administration, either internally or externally, of any drug to the horse. If the Stewards shall determine that any owner, trainer, groom or any other person, recited hereinbefore in this Rule, have failed to protect and guard said horse in accordance with this Rule, they may immediately suspend said trainer, groom or any other person and refer the matter to the Commission for final disposition.

[2] 16.46 When the Stewards feel that a Rule has been violated by any person, the procedure shall be as follows:

(a) He shall be summoned to a meeting before the Stewards, called for that purpose, and at which all Stewards shall be present.

The above described penalties, including Webb's suspension commencing June 20 through July 19, 1969, inclusive, resulted from this first hearing. Appellant appealed the order of the Stewards on June 20, 1969, and a *de novo* hearing before the State Horse Racing Commission followed on June 24, 1969, the result of which was an affirmance of the Stewards' Order.

Appellant subsequently perfected his appeal to this Court, but on July 8, 1969, after appellant had obeyed his suspension for twenty of the prescribed thirty days, the Honorable HOMER L. KREIDER, Presiding Judge of the Court of Common Pleas of Dauphin County, granted a Supersedeas reinstating appellant as a trainer at Liberty Bell Park pending the outcome of this appeal.

It should be noted also that, even though, oddly enough, appellant does not dispute the loss of the first-place purse, a great deal more hangs in the balance here than just the remaining ten days of Webb's suspension. As the written supplement to oral argument, stipulated to by counsel on each side, before this Court states:

(b) Adequate notice of said meeting shall be given the summoned party. The Stewards' decision as to what is adequate notice shall be final.

(c) No penalty shall be imposed until such hearing.

* * * * *

(e) No special announcement of the hearing or of the alleged infraction of Rules shall be made until after said hearings. Only in the event a penalty is imposed may the Racing Commission make a public statement.

* * * * *

(g) In all cases, notice of any penalty shall be given in writing to the party charged by posting the same on the board provided for same by the Association. The date of said posting shall be set forth in said notice of penalty. Immediately after the hearing, the Stewards shall transmit a written report thereof to the Commission, setting forth all pertinent facts concerning the same, including any penalty imposed.

"1. *Question:* Would there be any additional penalty to the trainer other than the 30 day suspension, were the ruling of the Commission to be upheld?

*Answer:* Yes. The Pennsylvania State Horse Racing Commission, together with 44 other commissions in 32 states, is a member of the National Association of State Racing Commissions (NASRC). Reports of trainer suspensions by member commissions are forwarded to the NASRC's national headquarters in Lexington, Kentucky, which then circulates the decisions to all members by means of the NASRC Bulletin of Official Rulings. Under the National Association's reciprocity rule, each member commission undertakes to extend recognition to the rulings of sister commissions in other states. Some members, including New Jersey, consider such reciprocity mandatory and treat a ruling of another state as though it were its own, so that a trainer may be refused licensure on the basis of a suspension in another state or, if he is already licensed, his license may be suspended or revoked for the same reason. An example will be found in Rule 515 of the Rules and Regulations of the *New Jersey Racing Commission,* which provides that: 'Any owner or trainer once having been suspended for violation of this Rule, and thereafter another analysis of saliva or other excretions or body fluids as above provided, *or as provided by any other racing commission or turf governing body,* of any horse owned or trained by the said owner or trainer shows that a stimulant, drug or narcotic has been administered, the same shall be considered a second offense, and the said owner or trainer or both shall then be ruled off of all tracks in New Jersey.' (emphasis provided)"

Appellant has advanced three contentions on this appeal:

(1) "Rules Nos. 15.02 and 15.06 of the Pennsylvania Rules of Racing, which on their face render a trainer an insurer of the condition of his horse, are void under the Due Process and Equal Protection clauses of the State and Federal Constitutions.";

(2) "Rules Nos. 15.02 and 15.06 of the Pennsylvania Rules of Racing are beyond the scope of the enabling legislation since they are not promulgated 'for effectively preventing the . . . administration of drugs . . . for the purpose of affecting the speed of horses in races in which they are about to participate,' the sole purpose for which rules and regulations can be prescribed by the Commission under the Enabling Act.";

(3) "The Commission's finding of fact that appellant 'failed to protect his horse' is not supported by the record. No evidence was introduced by the Commonwealth that appellant was in any way guilty of neglect in the care of his horse. On the contrary, the record clearly shows that appellant took every reasonable step humanly possible to protect his horse as required by the Commission's Rules. Nor is there any evidence in the record to suggest that the injection of two grams of the drug Phenylbutazone into Vertical Spin could in any way have affected his performance in a race seventy-two hours later."

The scope of our review in this appeal is prescribed by Section 44 of the Administrative Agency Law, Act of June 4, 1945, P. L. 1388, as amended, 71 P.S. §1710.1 et seq., which requires this court to affirm the adjudication of the State Racing Commission unless it was not in accordance with law or was an arbitrary, capricious, or unreasonable determination due to the absence of substantial evidence to support the findings. 71 P.S. §1710.44.

(1) *Are the Due Process and Equal Protection Clauses of the State and Federal Constitutions vio-*

*lated?* We believe that a careful reading of Rules
15.02 and 15.06 of the Pennsylvania Rules of Racing
demands the conclusion that, taken individually or to-
gether, these sections do not render a trainer an abso-
lute insurer of the condition of his horse, nor do they
violate the Due Process or Equal Protection clauses of
the Pennsylvania or United States Constitutions.

Appellant would have us believe that these rules au-
tomatically dictate a penalty on the owner or trainer
merely if a drug is found in the urine of a race horse
no matter how infinitely detailed the trainer's precau-
tions may have been to protect his horse. This is not
so.

Before carefully examining either rule, let us first
look to comparable rules in the four cases advanced by
appellant from other jurisdictions. These foreign de-
cisions, of course, are merely persuasive and not bind-
ing upon us. Since thoroughbred horse racing in con-
nection with the pari-mutuel wagering system was sanc-
tioned in Pennsylvania as recently as 1968, there is no
authority on point in this state to guide us.

Firstly, the pertinent rule in *Battles v. Racing Com-
mission,* 12 Ohio App. 2d 52 (1967), was: The trainer
shall be the *absolute insurer* of, and responsible for,
the condition of the horses entered in a race, *regard-
less of the acts of third parties.* Should the chemical
or other analysis of saliva or urine samples, or other
tests, prove positive, showing the presence of any nar-
cotic, stimulant, depressant, chemical or drug of any
kind or description, the trainer of the horse may, in
the discretion of the Commission, be subjected to any
or all of the following penalties: suspension, revocation
of license, being ruled off. In addition, the owner of
the horse, the foreman in charge of the horse, the groom,
and any other person shown to have had the care or
attendance of the horse *may, in the discretion of the*

*Commission,* be subjected to any or all of the aforesaid penalties. (emphasis added)

In that case, Butazolidin was also found in a horse's urine and, following a hearing before the Ohio State Racing Commission, the licenses of both the owner and the trainer were suspended for sixty days for violation of the above Rule 311 of the Ohio Rules of Racing. The Ohio Court of Appeals found that the rule was unreasonably and illegally applied to the facts and circumstances and that the suspension order was not supported by reliable, probative, and substantial evidence in accordance with law. The Court did not, however, rule on the constitutionality of Rule 311.

Secondly, the rule in question in *Brennan v. Illinois Racing Board,* 42 Ill. 2d 352, 247 N.E. 2d 881 (1969), which incorporated verbatim Section 3.2 of the Illinois Horse Racing Act, reads as follows: The trainer shall be the *absolute insurer* of and be responsible for the condition of horses entered by him in a race *regardless of the acts of a third party.* Should chemical or other analysis of saliva or urine samples, or other tests, show the presence of any drug of any kind or description, the Board *may in its discretion* suspend or revoke the license of the trainer, the stable foreman in charge of the horse, the groom, and any other person shown to have had the care or attendance of the horse. Ill. Rev. Stat. 1967, ch. 8, par. 37c-3. (emphasis added)

There, Ritalin, a psychic stimulant, was found in a horse's urine immediately after a race, and its trainer was suspended for violation of the above rule. The Illinois Supreme Court held Section 3.2 of the Horse Racing Act, because it made the trainer the absolute insurer of the condition of his horse under penalty of revocation of his license, invalid insofar as it authorized the Illinois Racing Board to revoke a license without any showing of fault. There was no evidence that

the trainer had any knowledge of the doping of his horse or that he actively participated in it. In light of the words "the Board may in its discretion" in the rule, the Court evidently felt that the Board had in effect abused its discretion because the trainer was penalized without a sufficient showing of some forbidden act or omission.

Thirdly, the rule at issue in *Mahoney v. Byers*, 187 Md. 81, 48 A. 2d 600 (1946), was: (d) If the Commission finds from analysis of the saliva or urine, or blood taken from a horse on the day of a race in which the horse ran, or from other competent evidence, that any drug has been administered to the horse within forty-eight (48) hours before the race, the trainer shall be subject to the penalties prescribed in sub-section (e) hereof, whether or not he administered the drug, or knowingly or carelessly permitted it to be administered. The fact that the analysis shows the presence of a drug shall be *conclusive evidence* either that there was knowledge of the fact on the part of the trainer or that he was guilty of carelessness in permitting it to be administered. (emphasis added)

The Maryland Racing Commission found this Rule 146 violated when a post-race analysis revealed Benzedrine in the saliva of a horse trained by Byers. The Maryland Court of Appeals agreed that the trainer's license should be restored to him because the above rule created an irrebuttable presumption which destroyed the right of the trainer to offer evidence to establish his innocence and, as such, was arbitrary and void.

Lastly, in *State v. Baldwin*, 159 Fla. 165, 31 So. 2d 627 (1947), the rule at issue was: 117. The trainer shall be the *absolute insurer* of and responsible for the condition of the horses entered in a race, *regardless of the acts of a third party*. Should the chemical or other analysis or saliva or urine samples or other tests prove

positive, showing the presence of any narcotic, stimu-lant, chemical or drug of any kind or description, the trainer of the horse *may* be suspended or ruled off, and in addition, the foreman in charge of the horse, the groom and any other person shown to have had the care or attendance of the horse *may* be suspended or ruled off *in the discretion of the Commission,* and for a like second or subsequent finding shall be ruled off. (Emphasis added)

Under this rule, the Florida Racing Commission suspended the license of a trainer after Benzedrine was discovered in the urine of a horse in his care. The substance of the evidence was that a groomsman in the trainer's employ placed bets on the drugged horse, cashed his winning tickets immediately after the race, and quit work without notice immediately after the trainer's suspension. The Supreme Court of Florida agreed that the license should be restored because it felt that the word "absolute" precluded evidence to the contrary, and that a hearing, even when granted, without the right to interpose reasonable and legitimate defenses did not constitute due process of law.

We feel that Rules 15.02 and 15.06 are less oppressive and far less objectionable than the four rules stated above. We likewise hesitate to follow strictly these four decisions either because they were primarily decided on the particular facts of the case, or because the portent of the applicable rule in the case is so dissimilar to the meanings of Rules 15.02 and 15.06. Nowhere in these latter Pennsylvania rules are the words "absolute insurer" or "regardless of the acts of a third party," nor are these rules so stringent as to declare a positive urinalysis "conclusive evidence."

In our judgment, Rules 15.02, 15.06, and other Pennsylvania rules clearly provide ample opportunity for an embattled trainer to demonstrate his innocence, and

likewise clearly provide that a penalty is not automatically imposed.

Thus, Rule 15.02 (see footnote 1) provides that any person who had care of the horse "shall be subject to disciplinary action as set forth in Rule 16.46, and such horse shall be declared unplaced . . ." Rule 16.46 (see footnote 2) is merely procedural in nature and by its express language provides that adequate notice be given to the party charged and that a full hearing be given by the Stewards, who then transmit a report to the Racing Commission which in turn may conduct its own hearing on the matter. In addition, parts (e) and (g) of Rule 16.46 contain language which suggests the possibility that no penalty will be imposed: *"Only in the event* a penalty is imposed . . ." (e); "notice of *any* penalty" and "including *any* penalty imposed" (g). Likewise, Rule 1.12[3] provides "The Stewards *may* fine, suspend, or rule off . . .", and the last sentence of Rule 15.04[4] uses the words *"may* be suspended". (emphasis added)

The only other possible objection to Rule 15.02 would be the words "and such horse shall be declared unplaced . . ." But even this is not done until after the hearing before the Stewards.

Turning to Rule 15.06, we again find nothing objectionable. The person in charge is "obligated to protect and guard the horse," but nothing in the rule demands disciplinary action if for some reason a positive chemical analysis results. Certainly the onus of a conclu-

---

[3] 1.12 The Stewards may fine, suspend or rule off any person who, in their opinion, has acted to the detriment of racing or violated the Rules.

[4] 1504 . . . Should the chemical analysis show that the saliva or other excretions or body fluids of any horse so analyzed contain any drug of any kind or description, the owner or trainer or both of said horse may be suspended or ruled off of all tracks in Pennsylvania.

sive presumption or of absolute insurability is not present, and the last sentence requires an investigation by the Racing Commission beyond a chemical analysis.

In addition, we find no merit in appellant's contention that Rules 15.02 and/or 15.06 deny him equal protection of the law. In fact, appellant does not press his equal protection contention in his argument but only discusses an alleged due process violation and further alleges the above rules to be arbitrary and unreasonable by claiming an equal protection encroachment.

The pledge of equal protection in the Fourteenth Amendment of the United States Constitution is fulfilled if the laws operate on all alike and do not subject an individual to an arbitrary exercise of the powers of government. Although our State Constitution contains no express guaranty in the terms of that contained in the Federal Constitution, certain sections of our Constitution have been construed as having the same force and effect as the equal protection clause of the Fourteenth Amendment. *See* 7 P.L.E. *Constitutional Law* §201 (1958).

We feel that the rules in question treat any trainer, or other individual who may be at fault, including Bryan Webb, alike. Each would be given the same notice, the same right to counsel, the same hearing before the Stewards and then, if necessary, before the Racing Commission, the same opportunity to be fully heard and to be fairly adjudged before a penalty, if any, would be imposed. Furthermore, in the exercise of the police power, and in the interest and for the protection of the public, the state may, without denial of the equal protection of the laws, reasonably regulate a business, a useful trade, occupation, or profession which may prove injurious to the public, just so the legislation is not discriminatory in the sense of applying unequally to persons pursuing or engaged in the same

calling, profession, or business under the same or like conditions and circumstances. *See* 7 P.L.E. *Constitutional Law* §206 (1958). Considering the nature of the pari-mutuel wagering system and thoroughbred horse racing in general, we see nothing arbitrary or unreasonable about Rules 15.02 and 15.06, and nothing about them that deprives Bryan Webb of equal protection of the law.

Briefly then, we understand appellant's contention to be that, arbitrarily and unreasonably, the effect of Rules 15.02 and/or 15.06 is to prevent the trial of facts and to call for license revocation without cause shown. We cannot accept this contention and, on the contrary, feel that these rules make manifest that punishment is not meted out unless a full hearing of the facts and circumstances indicate reprehensible conduct, no matter who is charged with a violation of the rules.

(2) *Are Rules 15.02 and 15.06 beyond the enabling legislation?* We conclude that Rules 15.02 and 15.06 are not beyond the scope of the enabling legislation which enumerates the general powers of the State Horse Racing Commission. The same enabling section on which appellant relies provides: "The Commission may adopt rules and regulations not inconsistent with this act to carry into effect its purposes and provisions and to prevent circumvention or evasion thereof." Enabling Act, 1967, Dec. 11, P. L. , No. 331, 32, 15 P.S. §2652(a). The beginning of part (b) of the same section says, "Without limiting the generality of the foregoing, and in addition to its powers:", 15 P.S. §2652 (b), and then continues in part (b)(2) with appellant's citation: "(2) The State Horse Racing Commission shall prescribe rules and regulations for effectually preventing the use of improper devices, the administration of drugs or stimulants, or other improper acts for the purpose of affecting the speed of horses in races in

which they are about to participate." In this light, Rules 15.02 and 15.06, although they deal with the forbidden administration of drugs, need only further the "purposes and provisions" of the Commission in order "to prevent circumvention or evasion thereof" and need not be specifically concerned with drugs or any other devices or acts which affect the speed of horses in races.

Even if these two rules were not under the general empowering language, it is naive to say that an analgesic such as Butazolidin does not affect the speed of a horse which has a sore ankle. Obviously, if the horse ran at all, it would run at a decreased speed, or at least slower than its normal capabilities, if not aided by a pain-killing drug. As the Racing Commission stated in its Finding of Fact No. 19: "Phenylbutazone and/or a derivative thereof does affect the speed of a horse in that it deadens the pain which would otherwise be suffered by a horse, causing it distress and during which period of pain the speed would be decreased."

The intended thrust of appellant's contention evidently is that even if the analgesic Butazolidin were active within the horse during the race, it did not enable Vertical Spin to run faster than his normal capabilities, hence the drug did not affect the speed of the horse. This speciously narrows the interpretation of the words "affecting the speed of horses" in the statute to mean only that *stimulating* a horse to run *faster* than it normally would is forbidden.

It is clear, however, from the words "drugs or stimulants" in 15 P.S. §2652(b)(2), "any forbidden narcotic, stimulant, depressant, local anesthetic, or analgesic" in Rule 15.02, "any drug" in Rule 15.06, and "racing condition" in Rule 15.09[5] that the Legislature

---

[5] 15.09 No person . . . shall have . . . any hypodermic syringes, hypodermic needles, or other devices, and any drugs . . . or shall use appliances—electrical, mechanical, or otherwise—other than

and the Racing Commission intended that any drug whatsoever was forbidden, even if it caused a horse to run faster or slower than it normally would run. Therefore, even a drug that would enable an ailing horse to run to the very limit of its normal capabilities, or even up to the fastest speed it had ever recorded, but no faster, still is forbidden.

The reason for the rule is obvious: it would be pure speculation in any one horse to permit the administration of that amount of drug which would bring the horse only up to par and no more. Briefly stated, the purpose of the Racing Commission in promulgating Rules 15.01 through 15.12, entitled "Illegal Practices," was to avoid, so far as possible, the use of medicine or drugs which might affect the normal ability of a horse to run in a race intended to be conducted under rules of honesty and fairness. Therefore, to allow the administration of any medicine or drug to a horse entered in a race would permit just that "circumvention or evasion" which §2652(a) aims to prevent.

(3) *Did appellant fail to protect his horse?* We feel that the Racing Commission's finding that appellant "failed to protect and guard" his horse is supported by the record.

The facts in this case are not in dispute. Bryan Webb had care of the horse Vertical Spin from May 31, 1969, the first day of the Continental Meeting at Liberty Bell Park. On Monday, June 9, 1969, Dr. Everett W. King, Jr., a doctor of veterinary medicine, duly licensed by the Pennsylvania State Horse Racing Commission, made his morning rounds at Liberty Bell Park, and in the course of which he examined the horses of appellant as well as those of other trainers. Dr. King, who was not an employe of Webb but was paid on a

---

the ordinary equipment, of such nature as could affect the speed or racing condition of a horse.

per visit basis, examined Vertical Spin and noticed a significant increase of fluid in one of the animal's ankle joints. Upon being told by appellant that Vertical Spin was to run in a race on the following Thursday, June 12, the doctor suggested that the horse's ankle be tapped.

Appellant instructed the doctor "To use his own judgment and take care of him" and "To do what he thought was necessary." This was the only discussion which transpired between appellant and Dr. King until after the race on June 12, although Webb testified that ordinarily when Dr. King came around each morning the two of them would discuss possible treatment to horses which Webb thought might need care. We can only assume that Dr. King visited the barn in which Vertical Spin was kept on Tuesday and Wednesday, June 10 and 11, during the course of his usual morning rounds, but there is no evidence in the record that Dr. King treated Vertical Spin until the day of the race, June 12.

On the afternoon of June 9, 1969, at approximately 4:00 p.m., Dr. King returned to appellant's stable and tapped Vertical Spin's ankle, injected the steroid Depo-Medrol and also gave the horse an intravenous injection of Butazolidin IV, a drug also known as Phenylbutazone, and known commonly in the trade as "Bute," in the amount of ten cubic centimeters or two grams, a dosage which the doctor described as a small one. Dr. King characterized Butazolidin as an anti-inflammatory drug which also acts as a pain reliever so that the horse can be trained, preferably by walking the horse on the two days following the tapping. He further testified that he was not instructed to make the injection by appellant, that he did not inform appellant before the race of the injection of Butazolidin into Vertical Spin, and that no discussion of the treatment

passed between the doctor and appellant prior to the race on June 12.

Dr. King further stated that the injection of Butazolidin into Vertical Spin was done solely in the exercise of his professional judgment and skill, and that "It was not uncommon for me to give the Butazolidin when I do tap horses." He also acknowledged that he was familiar with the fact that horses must continue training to be entered into a race and that Vertical Spin would have to continue training to run in the race on June 12.

The testimony reveals that Dr. King was licensed to practice veterinary medicine at tracks in Florida as well as Pennsylvania, but, as late as June 9, in contravention of Rule 3.04 ("The Veterinarians shall make daily reports to the State Veterinarian and to the Stewards of all horses under treatment by them."), had filed no reports of his treatments, and only filed a report on his treatment to Vertical Spin after the positive urinalysis report was in and an inquiry had begun. He explained this inaction by saying, "there was kind of turmoil here the first couple days."

There is no indication that Webb made any effort to discover from the reports normally available what treatment had been given to Vertical Spin. On the day of the race, June 12, Vertical Spin was treated by Dr. King with "Solu-Delta Cortef," but no further explanation is made as to what this was or what it was for.

Following the ninth race on June 12, in which Vertical Spin finished first, a specimen collector, in accordance with the rules of the Commission, collected a sample of urine from Vertical Spin. This was done at or about 8 p.m., or approximately 76 hours after Dr. King's injection of Butazolidin. A chemical analysis of the urine gave a positive result in the test for Phenylbutazone or Butazolidin, resulting in a recovery of

6.2 mg calculated with 200 ml of urine. The method or adequacy of this test is not in dispute.

The supervisor of the chemists who made the positive test, and who himself took part in the analysis, testified that he considered the 6.2 mg to be "a lot of drug. Let me say for a drug like amphetamine, we would be very happy if we had 500 micrograms. This is 6,200 micrograms. We expressed it in milligrams because the number gets unwieldy. That is a relatively large amount of drug." He also said that 200 ml is the standard amount of urine tested and that perhaps 10% more Phenylbutazone would have been recovered if other tests on the 200 ml of urine had not preceded that part of the urinalysis which revealed traces of Phenylbutazone.

Bryan Webb testified that no other drug was administered to Vertical Spin between Dr. King's treatment on June 9 and the race on June 12. Upon cross-examination, Webb's answers, in the following excerpts, are particularly revealing: "Q. Isn't it also true that when an ankle of a horse is tapped that it is painful for the horse in most instances? A. I would say yes, it is for humans and I would say so for horses too. Q. Being painful for the horses, it is then normal and customary for a veterinarian to give some type of painkiller to the horse to ease the pain, isn't that correct? A. Well, it would be according to the veterinarian, sir; some would and some wouldn't. Q. In your experience you are familiar with the fact that veterinarians do, as a rule, give a painkiller after they tap a horse's ankle, do they not? A. In some cases if a horse has a lot of inflammation in there, you give an anti-inflammatory injection to relieve the inflammation. I don't know what the amount of painkiller is that would produce it. Q. You say 'anti-inflammatory,' Mr. Webb, don't you mean you have to train these horses also after

they receive the shots? A. Yes, we do train them after they receive shots. Q. In Vertical Spin's case, didn't you in effect train that horse after its ankles were tapped prior to this race? A. Prior to the race. The next morning, after he was tapped, we walked him, and the next day he was ponied, and the next day he was walked and run. . . . Q. And then you did run it in the 9th race on the 12th? A. We iced him for two and a half hours and run him in the last race, yes, sir. Q. Isn't it true, Mr. Webb, after tapping of ankles that if a horse is suffering from pain as a result of this tapping, that you would then not be able to train, assuming the horse was suffering from pain, unless you gave it a shot of a painkiller—unless you gave it some type of painkiller? A. Would you say that again? [Question repeated] The Witness: If he was suffering from pain, we wouldn't train him."

If the horse would not be trained if suffering pain, why was Vertical Spin treated by Dr. King the day of the race, and why was its ankle iced before the race? Evidently Vertical Spin was in pain right up to the day of the race. Why then was he walked on June 10, the day after being injected with Butazolidin, galloped on the 11th, and then walked on the morning of the 12th, the day of the race? How was the horse trained if it still had pain?

It could be that the horse's sore ankle was iced on the 10th, 11th, and 12th before training him, but there is nothing in the record to that effect, and it would seem that if such were done it would have been mentioned in the testimony. It could also be that the original injection of Butazolidin remained in sufficient quantity in the horse's bloodstream in order to permit training on those three days. But Dr. Carl L. Gabriel, a veterinarian whose doctoral thesis, completed in 1964, concerned the pharmacology and toxicology of Phenyl-

butazone in thoroughbred race horses, testified that the maximum effect of the drug took place in the horse's bloodstream between two and four hours after administration. He also testified that he would not expect the drug to have any effect 72 hours after its administration (Dr. King thought the same), and that it would be reasonable to expect that the drug would be out of the horse's urine after 72 hours and certainly out of the horse's bloodstream.

What troubles us, and no doubt was disturbing testimony to the Racing Commission (taken with the urinalysis chemist's reaction to the amount of Phenylbutazone found), was this colloquy which subsequently followed (Dr. Gabriel answering): "Q. If there was a presence of 6.2 milligrams in 200 milliliters of urine, would you say that chances are the horse may have some of that Phenylbutazone in its blood? A. I would say, on the basis of that evidence, yes, the 6.2 milligrams. I have never seen quite this much in the urine after the administration of 2 grams even as more recently, say, 24 to 48 hours."

For some reason, Vertical Spin had a relatively large amount of Phenylbutazone in his urine after the race, and quite possibly had some of that drug in his bloodstream during the race, even after Dr. King administered what he considered to be a relatively small dosage of 2 grams 76 hours previously.

There is nothing in the record which reveals the precise time limits of each cycle in a horse's metabolism, evidently because the precise effects of Butazolidin on a horse are not known. There is one part of the testimony by Dr. Gabriel bearing on how soon urination expels from the horse's body a chemical substance which had been in the horse's bloodstream. The import of the words, however, is unclear: "Q. May Phenylbutazone be in the urine of a horse after it has left the blood-

stream? A. It may, but, of course, with the normal process, natural process of urination, there would not be a real long lag between the time it finally leaves the bloodstream and presence of blood in the urine. Q. There is some period of time it has left the blood and it is in the urine, is that correct? A. I would think so, yes. . . . Q. In other words, based upon your findings, you would have expected that such an injection would have been out of the horse's system long before [the race]? A. Yes. Q. And certainly out of the horse's bloodstream? A. Yes."

This would seem to mean that urination normally would have removed any traces of Butazolidin long before the sample was taken. The sheer amount of the drug remaining and the testimony by the chemist and by Dr. Gabriel as to its unusualness after so much time had elapsed since Dr. King's injection may have led the Commission to conclude that another injection of Butazolidin was given to Vertical Spin between June 9 and the time of the race. What remains unanswered and is most disturbing is why Webb did not check with Dr. King or the records usually on file to learn of the treatment especially if the horse was to be trained and then run in a race three days later; why Webb did not himself have the horse checked since it evidently was in pain and yet was still able to train indicating something was keeping it going; and, finally, why so much Butazolidin remained in Vertical Spin's urine so long after Dr. King's injection.

The foregoing study of the facts is not to say that the Commission reached its decision that Webb failed "to protect and guard" his horse by this exact interpretation of the facts or that this Court has interpreted the facts one way or the other. How we would have decided the matter is beside the point because our only function is to examine the facts to determine whether

sufficient evidence exists on which the Commission could have based its decision.

The Racing Commission, discreetly speaking, concluded that Bryan Webb failed "to protect and guard" his horse and then cited Rules 15.02 and 15.06 to state the more embarrassing particulars that a violation involving medicines or drugs had been committed. The Commission did not substitute for evidence of guilt a mere fiat (that the administering of a drug to a horse entered in a race is chargeable to the owner or trainer without regard to his knowledge of the fact or ability to prevent it), but instead conducted a formal proceeding upon notice with adversary parties, with issues on which evidence was adduced by both parties, and with ample opportunity for each party to be heard.

We feel constrained to hold that the record contains substantial evidence on which the Commission could have based its decision, and we see no abuse of discretion or error of law.

Order affirmed.