# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph J. Holloway, : 
                 Petitioner : 
                                 : 
        v. : 
                                 : 
Pennsylvania State Horse Racing : 
Commission, : No. 817 C.D. 2023 
                 Respondent : Argued: December 4, 2023

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE ELLEN CEISLER, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE FIZZANO CANNON         FILED: January 9, 2024

        Joseph J. Holloway (Holloway) filed a petition for review (Petition) of the July 27, 2023 Adjudication and Order (Order) of the Pennsylvania State Horse Racing Commission (Commission).[1] The Commission affirmed the decision of the Meadows Board of Judges (Meadows Judges) suspending Holloway's horse training license after a horse under his care tested above the violation threshold for testosterone.[2] Upon review, we affirm the Commission's Order.

---

[1] The Commission's Order was dated July 25, 2023, signed July 26, 2023, and mailed July 27, 2023.

[2] Holloway previously filed a motion for stay of the suspension pending the outcome of the Petition, along with expedited review, both of which this Court granted.

# I. Background

Holloway holds a horse trainer's license from the Commission. Reproduced Record (RR) at 543a.[3]  On June 26, 2021, Perfect Sting, a standardbred horse trained by Holloway, placed second in a race at Meadows Racing in Washington, Pennsylvania; through later disqualification of the winner, Perfect Sting ultimately placed first.  *Id.*  After the race, the Commission collected blood and urine samples from Perfect Sting and tested them for various substances.  *Id.* The Commission's testing lab found testosterone in a sample of Perfect Sting's blood at a concentration of 3,765 picograms per milliliter (pg/ml) +/- 141.6 pg/ml, and a follow-up test by an independent lab found testosterone at 3,635 pg/ml +/- 14 pg/ml. *Id.* at 544a.  Testosterone occurs naturally in horses, but the concentrations found exceeded the violation threshold testosterone level set by Commission policy for horses participating in races.[4]  *Id.*

In a December 29, 2021 ruling (Ruling), the Meadows Judges concluded that Holloway violated the Commission's regulations due to the testosterone levels found in Perfect Sting.  RR at 544a-45a.  The Ruling imposed a $500 fine, disqualified Perfect Sting as winner, ordered the $74,166 winner's purse redistributed, and imposed a 15-day suspension of Holloway's trainer's license. Pet., Ex. A at C-12.

---

[3] The pages in the Reproduced Record are improperly numbered using a capital "A" (1A, 2A, etc.).  Citations herein to the Reproduced Record use a small "a" as mandated by Rule 2173 of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 2173.

[4] The Commission apparently set the testosterone violation threshold via a policy statement effective October 1, 2008.  *See* Pet., Ex. H at C-23.

Holloway timely appealed the Meadows Judges' Ruling to the Commission on January 3, 2022.[5] RR at 545a. Holloway argued that the Ruling was arbitrary and capricious, asserting that testosterone is natural in horses and the violation threshold set by the Commission is without a scientific basis. Pet., Ex. A at C-14. The Commission held a hearing over two days, at which the Commission and Holloway, respectively, presented the testimony of two expert witnesses, Mary Robinson, VMD/Ph.D (Dr. Robinson) and Stephen Barker, DVM (Dr. Barker).

The Commission's expert, Dr. Robinson, described the process through which the Commission used statistics to determine a violation threshold for testosterone. *See generally* RR at 44a-60a. The Commission has set a violation threshold for testosterone of 2,000 pg/ml for intact male horses in standardbred racing, which the Commission based on multiple scientific studies. *Id.* at 549a. These studies and the violation threshold took into account the effects of seasonal variations and racing on testosterone levels. *Id.* at 550a-51a. Follow-up studies conducted after implementation of the violation threshold measured an "upper limit" of 1,546 pg/ml of testosterone in racing intact males. *Id.* at 552a. Tests from a laboratory in Pennsylvania of 17,780 samples, taken since 2010 from Pennsylvania racetracks, found only three samples, including that from Perfect Sting, that exceeded the violation threshold of 2,000 pg/ml. *Id.* at 554a. Dr. Robinson also testified that Perfect Sting had previously tested at 567 pg/ml and 443 pg/ml for testosterone in the summer months, when natural testosterone levels are expected to be elevated; notably, the 443 pg/ml level was revealed in a test performed just 41 days before the tests that revealed the 3,765 pg/ml level. *Id.* at 553a-54a. The

---

[5] The Commission granted a stay pending appeal for the duration of the proceedings before it. *See* Pet., Ex. A at C-15.

laboratory conducting the test of Perfect Sting did not specifically test to determine whether the testosterone detected was exogenous or endogenous, as the applicable regulation does not make such a distinction. *Id.* at 555a. However, Dr. Robinson opined, and the Commission found as a fact, that Perfect Sting's testosterone level was so high that it could not have occurred naturally. *Id.*

Petitioner's expert, Dr. Barker, testified critically concerning the Commission's testosterone violation threshold, pointing out purported shortcomings in the scientific research supporting the violation threshold. *See* RR at 344a-69a & 556a. He stated that some horses have natural testosterone levels at 4,000 or 5,000 pg/ml, and opined that testosterone should not be regulated at all in intact male horses. *Id.* at 556a-57a.

Holloway also presented the testimony of Karl Nagle, DVM (Dr. Nagle), the veterinarian who treated Perfect Sting. Dr. Nagle testified that Perfect Sting was consistently very aggressive, high-strung, and frequently biting and kicking. RR at 556a.

Holloway himself testified concerning his protection and supervision of Perfect Sting. Notably, he stated that he had installed security cameras and hired a security guard for those times when he was not physically present. RR at 81a. However, as the Commission observes, Holloway produced neither footage from a security camera from the relevant time period nor the testimony of the security guard. *Id.*

Following the hearing and post-hearing briefing by the parties, the Commission affirmed the Meadows Judges' Ruling. *See* RR at 569a. The Commission concluded the Commonwealth proved by a preponderance of the evidence that Holloway violated the Commission's regulations, based on the

4

elevated testosterone levels found. *Id.* at 510a; *see also id.* at 508a & 509a. The Commission found Dr. Robinson's testimony "persuasive, credible, and trustworthy." *Id.* at 563a. The Commission stated its view of the trainer responsibility regulations as "essentially making trainers strictly liable for things that happen under their watch," such that no direct evidence of any wrongdoing by Holloway was necessary to find a violation. *Id.* at 564a. The Commission posited that "it is unrealistic to require direct evidence of wrongdoing" in horse drugging cases. *Id.* The Commission also responded to Holloway's invocation of the evidentiary standard for expert testimony first announced in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923),[6] by pointing out that it is an evidentiary standard, not a standard for evaluating regulations. *Id.* at 566a-67a.

The Commission rejected Holloway's argument that the testosterone violation threshold is arbitrary and capricious, explaining that the violation threshold was set based on a regulation and therefore "is not the province for adjudicatory revisit." RR at 567a. The Commission relied predominantly on case law from other jurisdictions, but also cited *Commonwealth v. Webb*, 274 A.2d 261 (Pa. Cmwlth. 1971), in which, notably, this Court rejected a substantial evidence challenge to a violation, explaining:

> The foregoing study of the facts is not to say that the Commission reached its decision . . . by this exact interpretation of the facts or that this Court has interpreted the facts one way or the other. How we would have decided the matter is beside the point because our only function is to examine the facts to determine whether

---

[6] Under this evidentiary standard, which has been incorporated into the Pennsylvania Rules of Evidence, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . (c) the expert's methodology is generally accepted in the relevant field." Pa. R.E. 702(c).

5

> sufficient evidence exists on which the Commission could have based its decision.

*Id.* (quoting *Webb*, 274 A.2d at 272) (additional quotation marks omitted).

Counsel for the Commission informed Holloway that his suspension would begin August 2, 2023, and that his request to the Commission for a stay pending adjudication of the Petition had been denied. Pet., Ex. Q. Holloway timely filed the Petition with this Court, along with an Application for Stay and Motion for Expedited Decision, which this Court granted in a previous order.

In our opinion in support of the stay order, this Court observed that Holloway had not raised before the Commission his due process argument concerning improper notice via the charging instruments. That observation was supported by the Commission's quotation of a stipulation below that the only issues to be decided were whether the Meadows Judges' ruling "was proper under the Commission's medication/drug regulations and whether the violation threshold for testosterone established by the Commission is based on sound science." RR at 561a (quoting from the parties' stipulation). Therefore, we concluded that Holloway waived the due process issue by failing to raise it below. *See MEC Pa. Racing, Inc. v. Pa. State Horse Racing Comm'n*, 827 A.2d 580, 592 (Pa. Cmwlth. 2003), *as amended* (July 15, 2003).

However, we also determined that Holloway raised novel legal questions regarding the Commission's testosterone violation threshold. We are not aware of prior decisions by any court considering whether the Commission's testosterone violation threshold policy or the trainer responsibility regulations at issue are arbitrary and/or capricious. The regulations at issue here became effective October 19, 2019, *see* 49 PA.B. 6221 (2019), and have not yet been the subject of any judicial decisions concerning the proper standard of proof, or the standard of

6

review, when the Commission proceeds under these regulations. Thus, we concluded that the Petition presents novel and substantial questions of law as to the sufficiency of the evidence before the Commission and the validity of the Commission's regulations and testosterone violation threshold policy sufficient to justify a stay of Holloway's suspension pending the disposition of the Petition.

## II. Issues[7]

Holloway presents two legal theories for this Court's review. First, he posits that the Commission's decision was not supported by substantial evidence of either the presence of exogenous testosterone or the scientific viability of the chosen regulatory violation threshold testosterone level.[8] With respect to the presence of exogenous testosterone in Perfect Sting, Holloway maintains that the record contains no evidence of anyone having administered synthetic testosterone to Perfect Sting; nor does the record of the test results contain any evidence of the presence of any exogenous testosterone in Perfect Sting.

Second, with respect to the propriety of the violation threshold generally, Holloway contends that the scientific community has not set a widely

---

[7] "This Court's scope of review of an adjudication of the Commission is limited to a determination of whether constitutional rights were violated, whether findings of fact are supported by substantial evidence of record, or whether an error of law has been committed." *Vaders v. Pa. State Horse Racing Comm'n*, 964 A.2d 56, 58 n.5 (Pa. Cmwlth. 2009) (quoting *Monaci v. State Horse Racing Comm'n*, 717 A.2d 612, 616 n.15 (Pa. Cmwlth. 1998) (additional quotation marks omitted)). We review *de novo* any legal questions raised. *SugarHouse HSP Gaming, LP v. Pa. Gaming Control Bd.*, 136 A.3d 457, 476 (Pa. 2016).

[8] "Substantial evidence is such evidence that a reasonable mind would accept as adequate to support a conclusion." *Cashdollar v. State Horse Racing Comm'n*, 600 A.2d 646, 650 (Pa. Cmwlth. 1991) (citing *McKenna v. Pa. State Horse Racing Comm'n*, 476 A.2d 505 (Pa. Cmwlth. 1984)).

accepted level of testosterone that is considered normal in horses. Holloway further suggests the regulatory threshold is improper because it inexplicably regulates standardbred horses, such as Perfect Sting, but not thoroughbreds. Thus, Holloway asserts that the violation threshold has not been set using generally accepted scientific principles sufficient to constitute competent expert evidence, without which Holloway insists the record is insufficient to support the legal validity of the violation threshold.

In a related argument, Holloway asserts that the Commission's decision is arbitrary and capricious because it rests upon standards and theories that are rejected by the scientific community and most other jurisdictions, defy logic and common sense, and are inconsistent with the regulations the Commission itself applies to thoroughbred horses. Holloway also challenges the propriety of deeming a set violation threshold as automatically constituting substantial evidence that a horse has been administered or exposed to exogenous testosterone, where endogenous testosterone levels vary daily and there is no evidence of the presence of anything but endogenous testosterone. Thus, Holloway argues that the Commission's decision misapplied the law as well as being arbitrary and capricious and, accordingly, was manifestly unreasonable and constituted an abuse of discretion.

### III. Discussion

Holloway's violations as found by the Commission related to trainer responsibilities, a prohibition on drugs, and conduct detrimental to the sport.

Section 203.22 of the regulations addresses trainer liability and provides:

(a) The trainer is responsible for the condition of the horse entered in an official workout or race and is charged with the responsibility to guard and protect the horse at all times regardless of the trainer's location. The trainer shall be responsible for the presence of any prohibited drug, medication, agent or other substance, including permitted medications in excess of the maximum allowable level, in the horses. A positive test for a prohibited drug, medication or substance, including permitted medication in excess of the maximum allowable level, as reported by the Commission's testing laboratory, is *prima facie* evidence of a violation of this rule. In the absence of substantial evidence to the contrary, the trainer shall be responsible.

(b) A trainer shall prevent the administration, attempted administration or passive contamination by others, including the trainers' [sic] employees and assistants who have care, custody and control of the horse from any drug, medication or other prohibited substance that may cause a violation of these rules.

(c) A trainer shall immediately report to the Judges and the Commission Veterinarian if the trainer knows, or has cause to believe, that a horse in the trainer's care, custody or control has received any prohibited drugs or medications.

7 Pa. Code § 203.22.

Section 401.2(a) of the regulations, regarding prohibited substances, states in pertinent part:

(1) A horse participating in a race may not carry in its body a prohibited drug, medication, chemical, substance or any other substance foreign to the untreated horse, except as otherwise provided.

. . . .

(3) In addition to the Commission approved Prohibited Substances List and the provisions of Chapter 403 (relating to equine veterinary practices—temporary regulations), the term prohibited substance shall include:

. . . .

9

(iii)   Substances present in the horse in excess of concentrations at which the substances could occur naturally[.]

7 Pa. Code § 401.2(a).

Sections 401.41, 205.33, and 205.501(14) of the regulations address procedure and sanctions for violations. Section 401.41 directs the Commission to investigate the results of a positive test for a prohibited substance and authorizes boards of judges (in this case, the Meadows Judges) to conduct a hearing on whether a violation of the regulations has occurred, make findings, consider mitigating and aggravating factors, and impose penalties on a trainer for violations found. 7 Pa. Code § 401.41. Subsection (g) specifically authorizes redistribution of a winner's purse in the case of a positive test of a race-winning horse. *Id*. § 401.41(g). Section 205.33 further authorizes boards of judges "to charge any licensee for a violation of these [regulations]," and, if a violation or attempted violation is found, specifically authorizes, *inter alia*, fines and license suspension. 7 Pa. Code § 205.33(a), (b). Section 205.501 sets forth several specific grounds for which any licensee may be suspended and fined, including for "[a]ny other act or conduct detrimental to the sport or reflects negatively on the sport." 7 Pa. Code § 205.501(14).

**A. Substantial Evidence that Holloway Failed to Protect Perfect Sting**

Holloway first suggests that the Commission improperly imposed strict liability rather than requiring substantial evidence of exogenous testosterone in Perfect Sting and of his responsibility for the presence of that substance. We disagree.

The pertinent regulation does not impose strict liability; rather, it allocates the burdens of proof. As quoted above, it provides that "[a] positive test

10

for a prohibited drug, medication or substance . . . is *prima facie* evidence of a violation . . . " and that, "[i]n the absence of substantial evidence to the contrary, the trainer shall be responsible." 7 Pa. Code § 203.22(a); *see also Brown v. Pa. State Horse Racing Comm'n*, 499 A.2d 1132, 1134 (Pa. Cmwlth. 1985).

In *Webb*, this Court considered whether the Commission had imposed strict liability in applying the violation threshold. We observed:

> The [] Commission, discreetly speaking, concluded that [the trainer] failed "to protect and guard" his horse and then cited [former analogous rules] to state the more embarrassing particulars that a violation involving medicines or drugs had been committed. The Commission did not substitute for evidence of guilt a mere fiat (that the administering of a drug to a horse entered in a race is chargeable to the owner or trainer without regard to his knowledge of the fact or ability to prevent it), but instead conducted a formal proceeding upon notice with adversary parties, with issues on which evidence was adduced by both parties, and with ample opportunity for each party to be heard.

274 A.2d at 272.

Likewise, here, although the Commission used language suggesting strict liability, it actually considered the evidence presented and made findings and conclusions applying that evidence, as discussed above. It is true that the record contains no direct evidence proving that Holloway or one of his employees or agents injected Perfect Sting with testosterone. However, the Commission made findings of fact demonstrating test results of testosterone levels exceeding the regulatory threshold for a violation. Those findings established a *prima facie* case under 7 Pa. Code § 203.22(a), thus giving rise to a presumption of Holloway's liability under *Brown*. The burden then shifted to Holloway to rebut that presumption by evidence sufficient to demonstrate that he had satisfied his duty to protect Perfect Sting. When

11

asked whether there were eyes on Perfect Sting "24/7," Holloway responded, "As close as possible." RR at 81a. As set forth above, Holloway testified that he had security cameras and a security guard at his barn. *Id.* Notably, however, he did not present either camera footage or the security guard's testimony in evidence. *Id.* He did not even suggest that anyone checked the security camera video, either regarding the day in question or in general. *See id.*

In *Brown*, this Court rejected a trainer's challenge to the Commission's finding of a violation based on failure to protect his horse from administration of a prohibited drug. 499 A.2d at 1134. There, the trainer's testimony that he hired a night watchman for the horse was insufficient to rebut the regulatory presumption of liability, as the horse was not supervised 24 hours a day. *See id.*

Here, the Commission was not required to credit Holloway's testimony as sufficient proof of 24-hour-a-day supervision of Perfect Sting, particularly in light of his failure to produce either security video or the testimony of the security guard. Under this Court's reasoning in *Brown*, the Commission was within its discretion in finding that Holloway failed to sustain his burden of proving by a preponderance of the evidence that he had provided adequate protection of Perfect Sting. *See* RR at 568a.

## B. Sufficiency of the Process Setting the Violation Threshold

Holloway insists that the Commission's determination of the maximum testosterone level recognized as naturally occurring in standardbred horses was faulty and is out of date. However, both expert witnesses testified at length on this subject at the hearing before the Commission, and there were a number of supporting exhibits. *See generally* RR at 27a-325a & 333a-491a. The Commission's expert,

Dr. Robinson, testified regarding the extensive scientific studies that were performed before setting the violation threshold. RR at 44a-60a. The studies were specific to Pennsylvania and considered a number of variables, including the time of year, type of horse, breeding status of the horse, and geographic location. *See id.* at 276a-94a. There was also evidence that standardbred horses generally have lower testosterone levels than thoroughbreds and that of 17,780 standardbreds tested since 2010, only 3, including Perfect Sting, have had testosterone levels exceeding the threshold. *Id.* at 554a.

Holloway strenuously disputes the validity of the studies and Dr. Robinson's related expert opinion. However, the Commission is the finder of fact and the arbiter of witness credibility; "[t]his Court's limited scope of review on issues such as this . . . includes neither making findings of fact nor resolving credibility issues." *McKenna v. Pa. State Horse Racing Comm'n*, 476 A.2d 505, 507 (Pa. Cmwlth. 1984). The evidence supporting the regulatory threshold was not only substantial, but extensive, as discussed above. The Commission obviously found that evidence credible. *See, e.g.*, RR at 510a (concluding that "[t]he preponderance of the evidence supports that the threshold in this matter is supported by credible, accepted scientific methods"). Notwithstanding the vehemence of Holloway's arguments, the Commission's findings concerning the competing expert evidence constituted determinations of fact and credibility, which this Court may not reexamine on review. *See McKenna*, 476 A.2d at 507.

We also reject Holloway's *Frye* challenge. *Frye* relates to a rule concerning the admissibility of expert testimony. However, it is not applicable here. As this Court has explained, "[t]he *Frye* test is employed by courts to ensure that novel scientific evidence has obtained acceptance in the scientific community . . . .

13

However, 'a *Frye* analysis is not triggered every time science enters the courtroom; it only applies when an expert seeks to introduce novel scientific evidence.'" *Worley v. Cnty. of Del.*, 178 A.3d 213, 236 n.6 (Pa. Cmwlth. 2017) (quoting *Commonwealth v. Dengler*, 843 A.2d 1241, 1243 (Pa. Super. 2004)). Here, there is no suggestion that Dr. Robinson sought to introduce novel scientific evidence. That Holloway and his expert dispute Dr. Robinson's conclusions provides no basis to apply a *Frye* analysis. *See Commonwealth v. Puksar*, 951 A.2d 267, 276 (Pa. 2008) (explaining that "*Frye* does not operate to bar disputed conclusions of an expert, so long as the methodology employed is not novel").

Further, Holloway concedes that, under *Frye*, although an expert's methodologies must be generally accepted in the scientific community, the conclusions reached from the application of those methodologies need not also be generally accepted. *See Walsh v. BASF Corp.*, 234 A.3d 446, 456 (Pa. 2020) (citing *Trach v. Fellin*, 817 A.2d 1102, 1112 (Pa. Super. 2003) (*en banc*)).

Moreover, Holloway did not object to the methodology of the Commission's expert, Dr. Robinson, under the *Frye* standard at the hearing.[9] *Cf.* RR at 53a (objecting to Dr. Robinson's testimony concerning certain documents solely because Holloway's expert had not seen them previously), 59a (objecting to the form of certain testimony as lacking foundation) & 60a (objecting to the form of questions as unclear). Therefore, any such objection is waived. *See Cashdollar v. State Horse*

---

[9] Notably, Holloway's counsel expressly had no objection at the hearing to Dr. Robinson's admission "as an expert and qualified to render an opinion in the field of drug testing, detection, screening and quantification of the presence of chemicals in race horses, veterinary medical science and the pharmacological effects of drugs in race horses, including pharmacokinetics." RR at 44a.

14

*Racing Comm'n*, 600 A.2d 646, 649-50 (Pa. Cmwlth. 1991) (citing *Man O'War Racing Ass'n v. State Horse Racing Comm'n*, 250 A.2d 172 (Pa. 1969)).

Finally, we reject Holloway's suggestion that the absence of a parallel Commission regulation limiting testosterone levels in thoroughbreds somehow invalidates the existence of a limit regarding standardbreds. As the Commission observes, the Commission has separate bureaus regulating thoroughbreds and standardbreds, each with separate regulations. *Compare* 7 Pa. Code Subpart D, Chapters 201- 205 (governing Standardbred Racing), *with* 7 Pa. Code Subpart E, Chapters 301- 307 (governing Thoroughbred Racing). Indeed, the record contains evidence that there are statistically significant differences between average testosterone levels in the two breeds. RR at 53a. We agree with the Commission that one bureau's regulations are not arbitrary and capricious merely because they are not identical to those of the other bureau.

For all of these reasons, we reject Holloway's argument that the Commission's regulation limiting testosterone levels in standardbred horses is arbitrary and capricious.

## IV. Conclusion

Based on the foregoing discussion, the Commission's Order is affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

15

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph J. Holloway,          :
              Petitioner     :
                          :
           v.                 :
                          :
Pennsylvania State Horse Racing    :
Commission,                  :    No. 817 C.D. 2023
              Respondent     :

## O R D E R

AND NOW, this 9th day of January, 2024, the July 27, 2023 Order of the Pennsylvania State Horse Racing Commission is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge