Bruno Bellucci, Petitioner *v.* Commonwealth of Pennsylvania, State Horse Racing Commission, Respondent.

Bruno Bellucci, Petitioner *v.* Commonwealth of Pennsylvania, State Horse Racing Commission, Respondent. Penn National Racing Association et al., Intervenors.

Argued March 4, 1982, before Judges CRAIG, MAC-PHAIL and DOYLE, sitting as a panel of three.

*Richard J. Makoul,* for petitioner.

*Samuel F. Meisenhelder,* for respondent.

*Terry R. Bossert*, with him *Edward C. First, Jr., McNees, Wallace & Nurick*, for intervenors, Penn National Racing Association, Shamrock Racing Association and Mountainview Racing Association.

OPINION BY JUDGE DOYLE, May 27, 1982:

In this consolidated appeal, the petitioner, Bruno Bellucci (Petitioner), appeals from three orders of the State Horse Racing Commission (Commission), an independent administrative commission charged with the regulation of all pari-mutuel thoroughbred horse racing activities in Pennsylvania. At No. 1959 C.D. 1981, Petitioner requests our review of two Commission orders dated July 24, 1981, which affirmed two orders of the Board of Stewards of Penn National Race Track (Board) dated November 23, 1980 and December 31, 1980 which, *inter alia,* suspended Petitioner from racing for violations of Commission regulations pertaining to the supervision of horses. At No. 2308 C.D. 1981, Petitioner requests our review of a Commission order dated September 15, 1981, affirming three notices of ejectment issued pursuant to the provisions of Section 2662.1(c) of the Act of December 11, 1967 (Racing Act), P.L. 707, *as amended,* added by Section 1 of the Act of July 24, 1970, P.L. 634, 15 P.S. §2662.1(c), by the Penn National Racing Association, the Shamrock Racing Association, and the Mountainview Racing Association. We will affirm in both cases.

The facts in these cases are not in dispute. Petitioner was the trainer of a horse named "Brave Knight" which finished first in the second race at the Penn National Race Track on October 13, 1980. Chemical analysis of urine and split samples[1] taken from

---

[1] A "split" sample is a sample that is divided in two parts for the purpose of testing. Pursuant to the provisions of 58 Pa. Code §163.318(b)(2) urine samples are "split" if more than 50 cc are obtained. If "primary" samples result in an affirmative test result, an owner or trainer may request a test of the "split" sample.

"Brave Knight" following this race indicated the presence of the drug nalbuphine, a narcotic analgesic that is not naturally found in horses. Section 163.302 of Title 58 of the Pennsylvania Code (Code) provides in pertinent part that

[i]t shall be the intent . . . of this title (relating to illegal practices) to protect the integrity of horse racing, to guard the health of the horse, and to safeguard the interests of the public and the racing participants through the prohibition or control of all drugs and medications or substances foreign to the natural horse. In this context:

(1) No horse participating in a race shall carry in its body any substance foreign to the natural horse. . . .

Section 163.303 of Title 58 of the Code, in turn, provides in pertinent part that

(b) A finding by the Chemist that a foreign substance is present in the test sample shall be *prima facie* evidence that such foreign substance was administered and carried in the body of the horse while participating in a race. Such a finding shall also be taken as *prima facie* evidence that *the trainer and his agents responsible for the care or custody of the horse has been, had been, or may have been negligent in the handling or care of the horse.* (Emphasis added.)

Following a hearing before the Board on the "Brave Knight" drugging incident conducted on November 19, 1980, the Board issued a ruling which concluded, *inter alia,* that Petitioner had violated the Commission regulations noted above, and which ordered (1) that Petitioner be suspended from racing for a period of sixty (60) days, (2) that Petitioner's horses be suspended from racing pending their transfer or sale to

new owners, and (3) that "Brave Knight" be disqualified from the October 13, 1980 race he had participated in at Penn National Race Track for all purposes except pari-mutuel wagering. Petitioner subsequently appealed this determination to the Commission and requested a stay of the Board's decision which the Commission subsequently granted. Prior to a hearing on the merits of this appeal, however, "Run Bird Run," a horse owned and trained by Petitioner, finished third in the ninth race at Penn National Race Track on October 20, 1980, and subsequently tested positive for the drug acepromazine. A hearing on this matter was subsequently conducted before the Board on December 26, 1980, and from the evidence adduced at this hearing the Board concluded that Petitioner had once again violated Commission regulations, and accordingly ordered the suspension from racing of Petitioner and his horses and the disqualification of "Run Bird Run" from his October 20, 1980 race for all purposes except pari-mutuel wagering. Petitioner appealed this ruling to the Commission, and a hearing on both of the alleged offenses was conducted on March 31, 1981. From the evidence adduced at this hearing the Commission issued two adjudications and orders, concluding in each that Petitioner had negligently failed to protect his horses, and hence, that the Board had properly suspended Petitioner pursuant to the provisions of Section 163.309 of Title 58 of the Code which provides in pertinent part:

The owner, trainer, groom or any other person who is charged with the custody, care and responsibility of the horse, are all obligated to protect and guard the horse against the administration . . . of any drug to the horse. If the Stewards shall determine that any owner, trainer, groom, or any other person recited hereinbefore in this section, have failed to protect and

guard said horse . . . they may immediately suspend said trainer, groom, or any other person and refer the matter to the Commission for final disposition.

In its adjudication affirming the Board's November 23, 1980 order, the Commission, *inter alia,* imposed a sixty (60) day suspension on Petitioner.[2] In its adjudication affirming the Board's December 31, 1980 order, the Commission imposed a ninety (90) day suspension on Petitioner and imposed a $1,000.00 fine.[3] Petitioner subsequently appealed these adjudications to this Court and, in an order dated August 31, 1981, we stayed the Commission's July 24, 1981 orders pending a final disposition of Petitioner's appeal. Thereafter, on September 3, 1981, the Penn National Racing Association, the Shamrock Racing Association, and the Mountainview Racing Association[4] issued Notices of Ejection expelling Petitioner from the Penn National Race Course for behavior "inconsistent with the best interests of racing. . . ." Among the specific instances of misconduct noted by the associations in their notices were the positive test results from the October 13, 1980 and October 20, 1980 races discussed above and a third drugging incident which occurred on September 1, 1981.[5] Petitioner subsequently ap-

[2] The Commission also suspended Petitioner's horses pending their transfer to new owners and disqualified "Brave Knight" from the October 13, 1980 race for all purposes except pari-mutuel wagering.

[3] The Commission also suspended Petitioner's horses pending their transfer to new owners and disqualified "Run Bird Run" from the October 20, 1980 race for all purposes except pari-mutuel wagering.

[4] Each of these associations conducted races at the Penn National Race Track.

[5] It is not apparent from the record before us if the Board has taken any action as a result of this positive test result. The other instances of misconduct noted by the associations were "1. 11/10/79 —Aggressor in altercation in test barn, fined." and "2. 7/30/80— Improper profane and indecent language to an official, fined."

pealed these ejectments to the Commission and, following a hearing on September 8, 1981, the Commission affirmed. Petitioner's appeal to this Court at No. 2308 C.D. 1981 followed thereafter.

## I. Case No. 1959 C.D. 1981

Before this Court, Petitioner initially alleges that there is not substantial evidence of record to support the Commission's conclusion that he was negligent in supervising "Brave Knight" prior to its October 13, 1980 race, and "Run Bird Run" prior to its October 20, 1980 race. We disagree.

Before the Commission, Petitioner did not dispute the validity of the October 13, 1980 and October 20, 1980 affirmative drug test results, and in addition, testified that he left "Brave Knight" and "Run Bird Run" unsupervised for up to two hours prior to the October 13, 1980 and October 20, 1980 races. Petitioner further testified that he sometimes left his horses unsupervised for up to four hours at a time.

As we have noted above, Section 163.309 of Title 58 of the Code places an affirmative duty on a trainer to protect his horses from the administration of any prohibited drug. Section 163.303 of Title 58 of the Code in turn provides that an affirmative drug test result will be deemed *prima facie* evidence of a trainer's failure to fulfill this duty. While this presumption of negligence may be rebutted by evidence that the trainer took reasonable steps to protect his horses, *Commonwealth v. Webb,* 1 Pa. Commonwealth Ct. 151, 274 A.2d 261 (1971) *appeal dismissed,* 445 Pa. 604, 284 A.2d 499 (1971) (same proposition of law stated for a similarly worded predecessor to 58 Pa. Code §163.303), the record in this case is entirely devoid of such exculpatory evidence. Hence, we believe that the undisputed evidence of the affirmative test results, coupled with Petitioner's admission that he left his

horses unguarded, constituted sufficient substantial evidence to support the Commission's finding of negligence in this case.

Next, Petitioner alleges that Sections 11 and 12 of the Racing Act, 15 P.S. §§2661-2662, which authorize the Commission to suspend or revoke licenses or to impose fines of up to $5,000.00 for violations of the Racing Act or of the rules promulgated thereunder, violate the due process and equal protection clauses of the constitution since they "permit the arbitrary imposition of suspension and/or fines without any prior notice to the individuals affected as to what punishment may result from infractions of the rules." We disagree.

As to Petitioner's due process challenge, we note that Sections 11 and 12 of the Racing Act specifically place individuals on notice that any violation of the Racing Act or rules promulgated thereunder could result in a license suspension or revocation and/or the imposition of a fine of up to $5,000. Although, as Petitioner notes, an individual will not know exactly which of these penalties the Commission might impose for a specific violation of the Racing Act or of the rules, this flexibility is obviously necessary so that such factors as previous offenses and mitigating circumstances may be taken into account, and if the Commission in the exercise of its discretion imposes a penalty that is clearly inappropriate for the offense involved, an individual may seek appellate review. Accordingly, we do not believe that Sections 11 or 12 of the Racing Act violate the due process clause of the United States Constitution.

We also find no merit in Petitioner's equal protection challenge.

"The pledge of equal protection in the Fourteenth Amendment of the United States Constitution is fulfilled if the laws operate on all alike and do not sub-

ject an individual to an arbitrary exercise of the powers of government.'' *Id.* at 162, 274 A.2d at 267. In the present case, Petitioner has failed to allege, and we fail to perceive, how the provisions of Sections 11 and 12 of the Racing Act treat any individual or group differently from another. While it is true that the Commission in the exercise of its discretion could treat one individual or group differently from another, this mere possibility does not, in our view, render the Racing Act constitutionally infirm.

Finally, Petitioner alleges that the Commission abused its discretion by imposing a sixty (60) day suspension for his first offense and a ninety (90) day suspension and $1,000.00 fine for his second offense. In view of the importance of protecting horses from the illegal administration of drugs, and the resulting confidence in the fairness of thoroughbred racing in the Commonwealth that such protection brings, however, we cannot say that the Commission abused its discretion by imposing the penalty it did in this case.[6]

## II. CASE No. 2308 C.D. 1981

In this appeal, Petitioner initially alleges that the Commission erred as a matter of law in affirming the associations' September 3, 1981 Notices of Ejectment since, in Petitioner's view, this decision should not have been made in light of this Court's issuance of a stay in Petitioner's appeal at No. 1959 C.D. 1981 (Petitioner's appeal from the Commission's affirmance of the Board's suspension orders). We disagree.

We note that Petitioner has not raised the issues of *res judicata* or collateral estoppel since the legal

---

[6] Petitioner also argues in his brief to this Court that the Commission improperly stated that the drug acepromazine is a narcotic, a mistake which the Commission admits to in its brief. The question of whether acepromazine is a narcotic, however, is irrelevant to the issues before us.

issues involved in his ejectment appeal differ from those in his suspension appeal, and because the facts in each case are undisputed. Petitioner's Notices of Ejectment were issued by the associations pursuant to the provisions of Section 12.1 of the Racing Law where the operative legal question is whether an individual's presence on a track is "detrimental to the best interests of horse racing." The Rulings of the Board, however, suspending Petitioner from racing were issued pursuant to Section 163.309 of Title 58 of the Code where the operative legal question is whether a trainer or other individual responsible for the care of a horse has been negligent in protecting the horse from the administration of drugs. Since, therefore, the legal issues differed in each appeal to the Commission, we fail to see how the Commission's order sustaining the Board's suspensions, or our stay of that decision, in any way prevented the Commission from ruling on Petitioner's appeal from the associations' Notices of Ejectment.

Petitioner finally alleges that there is not substantial evidence of record to support the Commission's determination that his presence at Penn National would be detrimental to the best interests of racing. We believe, however, that the fact that horses under Petitioner's care and control were involved in three separate drugging incidents constitutes substantial evidence sufficient to support the Commission's determination that Petitioner's presence on the track would be detrimental to the best interests of horse racing, " 'a sport where the greatest importance should attach to dissipating any cloud of association with the undesirable, and in which the appearance as well as the fact of complete integrity is a paramount consideration. . . .' " *Daly v. Pennsylvania State Horse Racing Commission*, 38 Pa. Commonwealth Ct. 77, 81, 391 A.2d 1134, 1136 (1978) (quoting *Martin v. Monmouth Park*

*Jockey Club,* 145 F. Supp. 439 (D.N.J. 1956), *aff'd* 242 F.2d 344 (3d Cir. 1957)).

Accordingly, we will enter the following

ORDER

Now, May 27, 1982, it is hereby ordered as follows:

1. The Order of the Pennsylvania State Horse Racing Commission dated September 15, 1981, affirming the ejectments of the Mountainview Racing Association, the Penn National Racing Association, and the Shamrock Racing Association, is hereby affirmed.

2. The Order of the Pennsylvania State Horse Racing Commission dated July 24, 1981, affirming Ruling No. 76 of the Board of Stewards of the Penn National Race Track which, *inter alia,* suspended the petitioner, Bruno Bellucci for a period of sixty (60) days is affirmed, and said suspension shall commence upon the date of issuance of this order.

3. The Order of the Pennsylvania State Horse Racing Commission dated July 24, 1981, affirming Ruling No. 117 of the Board of Stewards of the Penn National Race Track which, *inter alia,* suspended the petitioner, Bruno Bellucci for a period of ninety (90) days is affirmed, and said suspension shall commence upon the completion of petitioner's sixty (60) day suspension.

Judge MENCER did not participate in the decision in this case.