## Helad Farms, Petitioner *v.* Commonwealth of Pennsylvania, State Harness Racing Commission, Respondent.

Submitted on briefs September 15, 1983 to Judges MacPhail, Doyle and Barbieri, sitting as a panel of three.

*Richard L. Caplan, Frumkin & Manta, P.C.,* for petitioner.

*Gerald T. Osburn,* Assistant Chief Counsel, for respondent.

Opinion by Judge Barbieri, January 4, 1984:

Before us is the appeal of Helad Farms from a final adjudication of the Pennsylvania State Harness Racing Commission (Commission) in the matter of *In Re: Anthracite Stables & Helad Farms* in which Appellant seeks relief from the disqualification by the Commission of certain of its horses. Appellant poses for our consideration two questions: (1) Did the Com-

mission abuse its·discretion in disqualifying Appellant's horses by "waiving a commission regulation for one horse owner while refusing to extend the same benefit to other similarly situated owners," and (2) whether the Commission's action was "in the best interest of horse racing when it knowingly disqualified some horses from racing yet simultaneously allowed other identically situated horses to race by accepting hand delivery of late qualifying payments in violation of its own regulations."

We will try to simplify the pertinent factual background. The Pennsylvania State Harness Racing Commission administers certain races known as the "Pennsylvania Sire Stakes" which are designated as Sire Stakes events in the Race Horse Industry Reform Act (sometimes Act), Act of December 17, 1981, *as amended,* P.L. 435, 4 P.S. §§325.101-325.402. In order to quailfy for entry in the races supervised by the Commission, certain periodic nominating and sustaining payments must be made into the Pennsylvania Sire Stakes Fund (Fund) for each horse which the owner intends to race in the Sire events. These staking payments are to be made for each horse as a yearling in order to qualify that horse to run as a two or three year old. By rule of the Commission authorized under Section 224(e) of the Act, 4 P.S. §325.224(e), which provides, *inter alia,* that the Commission "shall make the provisions and regulations as it shall deem necessary for the proper administration of·the eligibility restriction," it is provided that qualification payments must be made on or before March 15 and May 15 of a racing year. Failure to make timely staking payments in the first year bars a yearling from entry of future Sire Stakes races, whereas two and three year olds who are otherwise qualified are only excluded for failure of making payments ·for

entry in those events scheduled in the racing year in which such staking payments are not made. Eligibility under the Act to enter Sire Stakes races is limited to harness horses sired by standardbred stallions regularly studding in Pennsylvania. Staking payments for all of the horse owners involved in this case were made through a staking agent, Standardbred Stake Service of New York City (Standardbred), whose undertaking was to see that staking payment deadlines in various states were complied with. Esther Bruecks, principal of Standardbred, provided in a timely submission checks for all payments due May 15, 1982, but the checks were facially defective and were returned to Standardbred by Ralph A. Alfano, an employee of the Pennsylvania Harness Racing Commission, serving as Administrator of the Pennsylvania Sire Stakes Fund. Alfano personally contacted Bruecks and, without consulting the Commission, granted a waiver of the Commission guidelines, allowing additional time to correct the payments. He felt that he could exercise this discretion since the original submission, though defective, was timely. Alfano made further calls to Bruecks for completion of payments due, but to no avail. On June 3, 1982, Alfano consulted the Commission which voted to give Standardbred until the close of business on June 4, 1982, apparently 24 hours, to make proper staking payments. When no payments were received by the June 4 deadline, the Commission struck all of Appellant's yearlings, as well as other horses in similar default, by virtue of Standardbred's failure of compliance with payment requirements, except for horses of Lauxmont Farms.[1] Leeana Flaharty, acting on be-

---

[1] The Adjudication contains findings that in the past, there have been problems with Standardbred, but, "none of these prob-

half of Lauxmont, having learned from a source outside Pennsylvania of Standardbred's defaults in staking payments, called Alfano on or about June 3 and learned of the June 4 deadline. Alfano, again apparently without Commission authorization, agreed to accept hand-delivered payment on behalf of Lauxmont. As a result, Lauxmont qualified eight horses out of 27 involved in the required payment, disqualifying 19 including otherwise qualified horses owned by the Appellant. The record reflects that Alfano had time to identify and notify the owners represented by Standardbred of Standardbred's default in payments but did not do so. It is also evident that none of the owners except Lauxmont knew of Standardbred's default in making the sustaining payments due May 15, 1982. On or about June 9, 1982, Alfano received cashier's checks from Standardbred by mail[2] in the full amount required to qualify all of the disqualified horses. These checks were returned to Standardbred. The disqualification of Appellant's yearlings would disqualify them from racing forever.

It is of interest to note that the Fund in which participation has been denied to Appellant's horses consists of funds provided by the Commonwealth of Pennsylvania and also from the contributions made by the horse owners; that in the Paramutual Division

lems ever resulted in the disqualification of any horse;" that in the past the administrator of the Fund allowed defective checks to be "made good" after the due dates; that such "problems were not brought to the attention of the horse owners;" that "the Commission at no time, notified Appellant of its ruling concerning the necessity of mailing payments then in dispute, by June 4, 1982;" and that Appellant's 10 yearling horses were stricken from the list of entries but informal notice of such action was not given until "late in July, 1982."

[2] In the briefs submitted here, the parties indicate that the payments were received by mail on June 9, 1982.

the average purse would be about $37,000, and the purses in the Fairs Division average from $3,000 to $4,000, depending upon certain circumstances.

"It is clear that this Court must affirm an adjudication of the Commission unless constitutional rights were violated, the adjudication was not in accord with law, procedural rules were violated or a necessary finding of fact was not supported by substantial evidence." *Daly v. Horse Racing Commission,* 38 Pa. Commonwealth Ct. 77, 391 A.2d 1134 (1978). Citing *Daly,* Appellant states in its brief:

> The Commission's legislative mandate requires it to act at all times in the best interests of, or in a manner not detrimental to the best interests of, the racing sport . . . Appellant contends that upholding the Commission's determination in this case would undermine public faith and confidence in the impartiality of the Commission and would thereby subvert the interests of the sport. . . . The Commission's favorable handling in this case of a single horse owner of substantial size and prestige, in the absence of notice and opportunity to identically situated owners, inevitably taints the Sire Stakes with an appearance of impropriety which serves to pervert the image of the sport as a whole.

We see merit in these contentions of Appellant. As we stated in *Daly:*

> The Act clearly reflects the legislature's desire to maintain public respect and confidence in the sport of horse racing, and conduct which undermines that confidence need not be criminal in nature nor proved beyond a reasonable doubt. See Zeber Appeal, 398 Pa. 35, 156 A.2d 821 (1959). *It is sufficient that the complained-of conduct and its attending circumstances be such*

*as to reflect negatively on the sport.* (Emphasis added.)
*Id.* at 81, 391 A.2d at 1136.

We appreciate fully the conflict of principles that faced the Commission on receiving the payment tendered by Standardbred on or about June 9, 1982 in light of the fact that its agent Alfano was required to now qualify horses of only one of Standardbred's owner-principals. We understand, of course, that the Commission's rules and regulations must be enforced. On the other hand, the whole complex scheme devised by the legislature in the Race Horse Industry Reform Act points most clearly to the overriding purpose to foster an image of horse racing that would make the image of that "industry" an irreproachable one, even in the eyes of the skeptical public. Perhaps rules and regulations can be fashioned by the Commission to avoid what happened here. Such responsibilities are not ours, but are more properly within the mission entrusted to the Commission by the Legislature. We are convinced, however, and must so hold, that the result reached by the Commission in this case is repugnant to the over-all purpose of the Act; and that the duty of the Commission to avoid conduct, as stated in *Daly,* which would reflect negatively on the sport includes the obligation to avoid preferential treatment among horse owners whether wittingly or unwittingly. A preference, whether innocently or culpably granted, is generally the same in the eyes of the skeptic, and to the skeptical world is the equivalent of intentional preference. Such a preference, regardless of how effected, is unacceptable and, we believe, outside the scope of the Commission's discretion. While the default of the current agent is not the Commission's responsibility, avoidance of preferential treatment is. This could simply have been

avoided by enforcement of its rules, rather than the granting to Alfano of discretion to waive them. Of record, there is testimony of Alfano that the Ohio Commission does not accept late payments and apparently does not waive its deadlines and also his testimony regarding the Kentucky Sires Stake in an instance where the Kentucky Commission contacted the individual owners on learning that Standardbred was in default of making the sustaining payments there.[3] Evenhandedness in the treatment of horse owners by the Commission is an absolute. We conclude that the failure to accomplish this can besmirch the image of the sport. We hold, therefore, that the waiver of payment deadlines in this case, resulting to the advantage of one owner and thus to the disadvantage of others similarly represented, cannot be approved. Accordingly, we will reverse.

It is our view that, insofar as is possible, all owners whose payments were tendered by Standardbred on June 9, 1982, and rejected by the Commission, should be given an opportunity to make payments which will qualify their horses equally with those of Lauxmont, should such owners wish to do so, and we will so order.[4]

ORDER

AND Now, January 4, 1984, it is ordered that the Commission,

1. Within ten (10) days of the publication of this Order, give registered mail notice to all claimants of

---

[3] The Commission's 28th finding reflects this testimony of Alfano.

[4] We are aware that this is not a class action, but a failure to provide to the class which includes Appellant, the same opportunity to qualify that we must order for Appellant would put us in the same posture of granting the kind of preference which we here condemn.

Standardbred on whose behalf payments were tendered on or about June 9, 1982, that accomplishment of all qualifying payments within ten (10) days from the date of such mailing will be accepted in satisfaction of unpaid staking charges due May 15, 1982, or due thereafter on horses who would be qualified by timely payment of amounts due on that date, and

2. Upon receiving such payment, qualify otherwise qualified horses of Appellant and other owners whose payments were rejected on or about June 9, 1982, as if such payments had been timely made, insofar as this is possible and is desired by such owners.

Jurisdiction is retained.

Judge JOHN A. MACPHAIL dissents.

———

CONCURRING OPINION BY JUDGE DOYLE:

I can concur only in the result. Under these exceptional circumstances, I believe there was an affirmative duty to notify *all* the owners once Lauxmont Farms had knowledge of the impending default and had directly contacted the Commission.