535 A.2d 239

Karl S. Korte, Petitioner *v.* Commonwealth of Pennsylvania, State Horse Racing Commission, Respondent.

Argued October 5, 1987, before Judges CRAIG, DOYLE and BARRY, sitting as a panel of three.

*Sanford S. Finder, Finder, Allison, Olschock & Graham,* for petitioner.

*John B. Hannum, Jr.,* with him, *John W. Schreck,* for respondent.

OPINION BY JUDGE CRAIG, December 21, 1987:

Karl S. Korte appeals an order of the State Horse Racing Commission denying him a license as a jockey. The commission found that Korte's previous conduct in his professional associations, his departure from the United States, and his failure to seek a commission investigatory hearing in a timely manner justified denial of the license as a matter of law. We reverse.

The two primary issues on appeal are (1) whether the commission could properly rule that the denial of a license was in the best interest of racing without making specific negative findings regarding Korte's experience, character and general fitness, and (2) whether the commission's ruling was supported by substantial evidence.

The commission's findings establish all of the facts here recited:

Korte had been a jockey most of his professional life, licensed in Pennsylvania since the late 1960's. While Korte was racing for trainer Eugene Zeek, Korte lived in Zeek's home during the latter part of 1973, a period during which a Mr. Poleto from New York City was also staying there. Late in 1973, Korte learned that Poleto had been involved in the killing of Joseph Gallo in New York City, and that Zeek was planning to pass bad checks totalling over one million dollars at three Pennsylvania racetracks. Poleto and Zeek told Korte that he was going to have to accompany them out of the country. Zeek threatened Korte, saying that both his life and that of his daughter would be in danger if Korte did not leave the United States. Korte departed for Grenada with Zeek and Poleto on December 31, 1973.

When Korte failed to fulfill a riding obligation on December 31, a fifty dollar fine was assessed against him. Later, after his stay in Grenada, Korte had the opportunity to ride horses in Trinidad. Korte inquired into the status of his license in Pennsylvania, discovered the outstanding fifty dollar fine, and paid it.

On August 10, 1978, the commission suspended and revoked Korte's license pending his appearance before the commission for an investigatory hearing, and stated that "further approval of such privilege shall be withheld pending appearance which shall be upon the request of the applicant and at any time so requested."

After Korte left Grenada with Zeek in 1978, they parted in Martinique. Korte worked at various odd jobs on yachts between 1978 and 1985, in the Caribbean and in Europe. Korte returned to the United States in March 1985 and began exercising horses in New York, until his New York license was withdrawn under a reciprocal licensing agreement with Pennsylvania. Korte

then began working on a farm in New Jersey, but lost that job as well because of problems with his Pennsylvania license.

Korte applied to the commission to renew his license in August 1985. The commission denied the application September 3, 1985 and denied Korte's appeal September 9, 1986.

In discussing its denial of the appeal, the commission noted that Korte had never responded to the commission's 1978 request to appear before an investigatory hearing, and that, by the time Korte did request such a hearing in 1985, the issue under investigation was moot: "Mr. Zeek had returned to the United States and had been convicted, and the passage of time made it difficult, if not impossible, to conduct a meaningful hearing on Mr. Zeek's actions in 1973." The commission noted that Mr. Korte may have been the victim of circumstance and of the conduct of others, but found it reasonable to deny him a license at this time:

> . . . the commission was faced with an application from a jockey who had departed this country without notice, under suspicious circumstances, had been in the company of an individual who had defrauded racetracks, and who had not engaged in racing or other licensed activity from 1973 to 1985. . . . Under the circumstances, the commission can correctly decide that it would not presently be in the best interest of racing to give Mr. Korte a license.

Our limited scope of review requires that we affirm an adjudication of the commission unless constitutional rights were violated, the adjudication was not in accordance with the law, procedural rules were violated, or necessary findings of fact are unsupported by substantial evidence. Substantial evidence is evidence that a reasonable mind would accept as adequate to support a

conclusion. *McKenna v. Pennsylvania State Horse Racing Commission,* 83 Pa. Commonwealth Ct. 116, 476 A.2d 505 (1984).

Section 213(f) of the Race Horse Industry Reform Act, Act of December 17, 1981, P.L. 435, *as amended,* 4 P.S. §325.213(f) provides:

(f) The commission may suspend, refuse to renew or revoke a license issued under this section, if it shall determine that:

(1) The applicant or licensee:

(i) has been convicted of a crime involving moral turpitude;

(ii) has engaged in bookmaking or other form of illegal gambling;

(iii) has been found guilty of any fraud in connection with racing or breeding;

(iv) has been guilty of any violation or attempt to violate any law, rule or regulation of any racing jurisdiction for which suspension from racing might be imposed in that jurisdiction;

(v) has violated any rule, regulation or order of the commissions; or

(vi) has been convicted of a felony offense related to the use, possession or sale of drugs or alcohol.

(2) That the experience, character or general fitness of any applicant or licensee is such that the participation of the person in horse racing or related activities would be inconsistent with the public interest, convenience or necessity or with the best interests of racing.

Korte's first claim, that the commission improperly denied his application without making specific findings regarding his experience, character or general fitness, rests upon a premise that the issue of public confidence

in racing is not a recognized basis for denying a license application. Korte contends that the grounds for denial or revocation are limited to criteria listed in section 213(f)(1). However, our reading of section 213(f)(2) indicates that the legislature intended the commission to look beyond an applicant's official record when considering denial or revocation of a license. As noted in *Helad v. State Harness Racing Commission*, 79 Pa. Commonwealth Ct. 314, 320, 470 A.2d 181, 184 (1984):

> . . . [T]he whole complex scheme devised by the legislature points most clearly to the overriding purpose to foster an image of horseracing that would make the image of that 'industry' an irreproachable one, even in the eyes of the skeptical public. . . .

The *Helad* court relied in part on analysis from *Daley v. State Horse Racing Commission*, 38 Pa. Commonwealth Ct. 77, 81, 391 A.2d 1134, 1136 (1978):

> The Act clearly reflects the legislature's desire to maintain public respect and confidence in the sport of horseracing, and conduct which undermines that confidence need not be criminal in nature nor proved beyond a reasonable doubt . . . It is sufficient that the complained of conduct and its attending circumstances be such as to reflect negatively upon the sport.

We conclude that Korte's past association with Zeek and Poleto, the circumstances regarding his sudden departure from the United States, and his activities during the years preceding his return were all proper subjects for consideration regarding Korte's experience, character and general fitness.

The question remains whether there was substantial evidence to support the commission's ruling that granting Korte a license at this time would not be in the best interest of racing. After reviewing the record, we conclude that there was not.

Korte testified that he had immediately found an apartment and moved out of Zeek's house when he learned Poleto's true identity. Korte also testified he learned of Zeek's check writing scheme at approximately the same time that Zeek and Poleto began to pressure him to leave the country with them. The commission acknowledged Korte's claim of duress, but quickly dismissed it: "The possible existence of duress does not negate Mr. Korte's association with Mr. Zeek, nor does the alleged duress wash away the fact that Mr. Korte's associations were not in the best interest of racing." The commission appears to have ignored the fact that until Zeek fled the country, he was a trainer in good standing in Pennsylvania; in fact, his fraud scheme capitalized upon the reputation and connections he had established at Pennsylvania racetracks. The commission's own findings indicate that Korte's relationship with Zeek soon became involuntary, characterized by threats and duress against Korte.

The commission also overlooked the fact that the 1978 letter sent to Korte requesting his presence at an investigatory hearing was completely open-ended as to a time limit for a reply. We do not understand how the commission can fault Korte for not requesting a hearing until 1985, when the commission itself did not establish any time frame, nor even initiate its own investigation when Zeek returned to the United States in 1978.

The commission contends that by the time Korte returned it was impossible to conduct a hearing; and that, in any event, the basis for such a hearing was moot. The commission never specifies why an investigatory hearing is not feasible at this time, stating only that "the passage of time had made it difficult, if not impossible, to conduct a meaningful hearing on Mr. Zeek's actions in 1973." Nothing in the record indicates that the

commission made any effort to investigate Zeek's fraud once Korte returned and requested a hearing. The commission's position effectively denies Korte the opportunity to clear his name of any connection with Zeek's fraud.

In short, this record does not establish any wrongdoing by Korte, other than the missed race in December of 1973, for which he paid his fine, and the possibly unsavory association with Poleto and Zeek, which, after being sustained by duress, ended not later than nine years ago.

Finally, the commission's suggestion that denial of the license at this time does not necessarily prejudice any future application by Korte, supported by substantial evidence of his "responsible conduct and good associations," is disingenuous and—considering the absence of evidence as to bad conduct or associations for nearly a decade—appears to shift the burden to Korte. Indeed, Korte testified that he has had offers of employment contingent upon having the suspension removed.

Therefore, our review of the record leads us to conclude that the commission's finding, that granting Korte a license is not in the best interest of racing, is not supported by substantial evidence. The commission's denial of a license is therefore reversed.

## ORDER

Now, December 21, 1987, the order of the State Horse Racing Commission, No. 85-042, dated September 18, 1986, is reversed.