# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Juan Vazquez, | : | |
| Petitioner | : | |
| | : | |
| v. | : | No. 1169 C.D. 2022 |
| | : | Submitted: May 12, 2023 |
| Pennsylvania State Horse | : | |
| Racing Commission, | : | |
| Respondent | : | |

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, President Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge
            HONORABLE LORI A. DUMAS, Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIRER**                     **FILED:  June 29, 2023**

Juan Vazquez (Petitioner) petitions for review of the September 27, 2022 Adjudication and Order (Adjudication) of the Pennsylvania State Horse Racing Commission (Commission) that affirmed the decision of the Board of Stewards (Stewards) at Parx Racetrack (Parx) suspending Petitioner's Commission-issued owner and trainer licenses for the remainder of their terms.  The suspension arose out of the Stewards' conclusions that Petitioner shipped a horse he was training, Shining Colors, from Belmont Park (Belmont) in New York to Parx in Bensalem, Pennsylvania, on January 6, 2022, while the horse "was suffering from [a] severe chronic condition and should never have been shipped" and had been "grossly negligent, cruel and abusive" in violation of Sections 185.2, 185.7(b), 303.15(5), and 401.62 of the Commission's Regulations (Regulations), 7 Pa. Code §§ 185.2,

185.7(b), 303.15(5), and 401.62. (Adjudication at 2 & n.1 (quoting the Stewards' Decision, Reproduced Record (R.R.) at 279a).) Based on the evidence presented at a hearing before the full Commission, the Commission agreed with the Stewards that Petitioner violated these provisions and upheld the suspension. On appeal, Petitioner argues the Commission's findings and conclusions are not supported by substantial evidence, are legally erroneous, and are inconsistent with a decision made by the race stewards of New York. Because the testimony credited by the Commission, including all reasonable inferences derived therefrom, support the Commission's findings and determinations, and we discern no error in the Commission's Adjudication, we affirm.

## I.    BACKGROUND

Petitioner holds an owner's license, issued on January 26, 2022, and running through January 26, 2025, and a trainer's license, issued on January 26, 2022, and running through January 26, 2023. (Adjudication, Findings of Fact (FOF) ¶¶ 1, 4.) Petitioner has held an owner's license since 2004 and a trainer's license since 2008. (*Id.* ¶¶ 3, 6.) Petitioner has been a horse trainer for about 25 years and was the trainer for Shining Colors since July 2021. (*Id.* ¶¶ 9-10.) On January 6, 2022, Petitioner decided to ship Shining Colors, along with a second horse, from Belmont to Parx; Petitioner drove the horse trailer himself. (*Id.* ¶¶ 18-19, 21.) Shining Colors was housed at the stables at Parx from January 6 until January 9, 2022, during which time the horse received no veterinary care. (*Id.* ¶¶ 67-69.) On January 9, 2022, Dr. Gabrielle Baiman (Dr. Baiman), a veterinarian at Parx, was called to Shining Colors' stall because the horse "was 'not doing very well.'" (*Id.* ¶ 49.) Following an examination and x-rays, Dr. Baiman euthanized Shining Colors with Petitioner's permission due to a severe case of laminitis. (*Id.* ¶¶ 40, 53-54, 62, 71-75.) As

2

discussed more fully below, a necropsy was performed on Shining Colors on January 10, 2022, by Dr. Julie Engiles (Dr. Engiles). Dr. Engiles' necropsy report was sent, with all of the identifying information redacted, to Dr. E. Scott McAllister (Dr. McAllister), for his independent review.

### A. *Proceedings Before the Stewards*

The Commission implemented an investigation of Shining Colors' shipment to Parx and treatment thereafter to determine whether any conduct had occurred that was detrimental to the best interests of racing, which culminated in a June 23, 2022 hearing before the Stewards. (R.R. at 279a.) At the hearing, the Commission's Director of Racing Enforcement, Jason Klouser (Director Klouser), described his investigation and read into the record relevant portions of Dr. Baiman's and Dr. McAllister's reports, which Dr. Baiman and Dr. McAllister confirmed at the hearing. (*Id.* at 307a-14a.) Dr. Baiman's report reflected her treatment of Shining Colors on January 9, 2022, including that when she arrived at the horse's stall, Shining Colors was in severe discomfort, could not stand on its own, was extremely cellulitic in its right forelimb, and suffered from severe laminitis in the left front foot to the point that its coffin bone was only one or two millimeters from bursting through the foot. (*Id.* at 308a-10a.) Per their reports and testimony, Dr. Baiman and Dr. McAllister opined: Shining Colors' conditions were severe, chronic, had not occurred overnight, and had been present for a long time or weeks; Shining Colors had been in severe pain and would have been in that pain during shipment; and Shining Colors should not have been shipped and doing so would be inhumane and/or negligent. (*Id.* at 310a-13a, 325a-26a.) Dr. McAllister called Shining Colors' condition "catastrophic" and justified euthanasia, and noted the severity of Shining Colors'

3

condition would have been known prior to its shipment from Belmont to Parx. (*Id.* at 312a-13a.)

Petitioner, appearing pro se before the Stewards, did not question any of the witnesses but stated Shining Colors was "scratched" from a race on December 11, 2021, had an issue with swelling in its right leg beginning around that time believed to be the result of a rat bite, and received treatment of its leg from Dr. Luis Perez in New York, which caused the swelling to go down. (*Id.* at 316a-19a.) Petitioner testified Shining Colors was walking fine, Dr. Perez last treated Shining Colors on January 5, 2022, and Petitioner requested and received a certificate of veterinary inspection (CVI) from Dr. Perez to ship Shining Colors, which he gave to someone at Parx. (*Id.* at 319a-24a, 328a-29a.)

On July 7, 2022, the Stewards issued its decision, finding that the veterinary evidence presented revealed that "'Shining Colors' was suffering from [a] severe chronic condition and should never have been shipped to Parx . . . by [Petitioner]." (*Id.* at 279a.) The Stewards determined, based on the evidence, that Petitioner "was grossly negligent, cruel and abusive in the shipping of . . . 'Shining Colors' from Belmont [] to Parx [] in violation of" Sections 185.2, 185.7(b), 303.15(5), and 401.62 of the Regulations.[1] (*Id.*) Based on these determinations, the Stewards fined

---

[1] Section 185.2 "Conduct of licensee" provides:

> A licensee shall not, alone or in concert with another person, engage in inappropriate, illegal or unethical conduct which violates the Commission's rules and regulations of racing, is inconsistent with the best interests and integrity of racing or otherwise undermines the general public's faith, public perception and confidence in the racing industry.

7 Pa. Code § 185.2. Section 185.7(b) "Protection of horses" provides:

**(Footnote continued on next page…)**

4

Petitioner $5,000.00 and suspended all of Petitioner's current licenses for their remaining terms. (*Id.*) Petitioner appealed the Stewards' Decision to the Commission.[2]

## B. *Proceedings Before the Commission*

The Commission, sitting *en banc*, held a *de novo* hearing on Petitioner's appeal. At that hearing, Director Klouser, and Drs. Baiman, Engiles, and McAllister,

---

> (b) No licensee or other person under the jurisdiction of the Commission shall subject or permit any animal under the licensee's care, custody, control or supervision to be subjected to or to incur any form of cruelty, mistreatment, neglect, abuse or abandonment. No licensee shall injure, maim, kill, administer a noxious substance to or otherwise deprive any animal of necessary veterinary care, sustenance or shelter.

7 Pa. Code § 185.7(b). Section 303.15(5) "Other duties and responsibilities of trainers" provides:

> In addition to the duties and responsibilities set forth in [Sections] 303.13 and 303.14 (relating to trainer responsibility rule; and responsibilities of trainers), a trainer shall also be responsible for:
>
> . . . .
>> (5) Ensuring the adequate care, custody, condition, fitness, health, safety and security of horses under his/her care, custody, and control[.]

7 Pa. Code § 303.15(5). Section 401.62 "Mistreatment of horses" provides:

> A licensee or other person under the jurisdiction of the Commission may not alone or in concert with another person permit an animal under his control to be subjected to a form of cruelty, mistreatment, neglect or abuse or abandon, or to injure, maim or kill or administer a noxious or harmful substance to or deprive an animal of necessary care, sustenance, shelter or veterinary care.

7 Pa. Code § 401.62.

[2] Petitioner requested a stay of the Stewards' Decision from the Commission, which was denied. Following the Stewards' Decision and the Commission's denial of Petitioner's requested stay, and prior to the Commission holding a hearing on and deciding Petitioner's appeal, Petitioner sought relief, including a preliminary injunction, from this Court in its original jurisdiction, which was denied after a hearing. *Vazquez v. State Horse Racing Comm'n* (Pa. Cmwlth., No. 363 M.D. 2022, filed Aug. 15, 2022).

all of whom were accepted as experts in veterinary medicine, testified in support of the Stewards' Decision. Petitioner presented his own testimony, as well as that of Angel Herrera and Ana Nieves, both of whom worked for Petitioner at Parx and were with Shining Colors between January 6 and 9, 2022, and Dr. Joseph Bertone, who was accepted as an expert in veterinary medicine.

Relevantly, Dr. Baiman testified, consistent with her report and in addition to the above facts, as follows. Shining Colors was in extreme discomfort and pain on January 9, 2022, from the severe cellulitis on its right front leg and severe laminitis in its left front hoof, conditions that did not become so severe overnight and would have existed on January 6, 7, and 8, 2022, and possibly for at least three weeks prior to that time. (FOF ¶¶ 51, 55, 58, 60, 65, 81-85.) Shining Colors would have been in pain on January 6, 7, or 8, 2022, and did not receive any veterinary care at Parx on those days, even though, in Dr. Baiman's opinion, the horse would have needed such care. (*Id.* ¶¶ 66-68, 70, 80, 86.) After x-rays revealed the severity of Shining Colors' left hoof laminitis, which included the sinking and rotation of the coffin bone, Dr. Baiman called Petitioner to explain the situation and the need for Shining Colors to be euthanized. (*Id.* ¶¶ 71-72.) Petitioner reviewed the x-ray and called Dr. Baiman back after five minutes and agreed to euthanize Shining Colors. (*Id.* ¶¶ 73-74.) Dr. Baiman learned from Petitioner that Shining Colors' cellulitis was preexisting and was being treated at Belmont. (*Id.* ¶¶ 76-77.) Dr. Baiman recalled that Petitioner indicated his normal veterinarian was going on vacation and shipped Shining Colors to Parx to keep a "closer eye" on the horse. (*Id.* ¶ 78.) Dr. Baiman opined Shining Colors should have been examined prior to shipping and was not in a condition on January 6, 2022, to have been shipped due to it being in pain, and it was cruel, inhumane, and grossly negligent to do so. (*Id.* ¶¶ 76-77, 80, 88-91.) Dr.

6

Baiman believed the responsibility for shipping Shining Colors fell on its trainer, Petitioner. (*Id.* ¶ 92.)

Dr. Engiles testified about Shining Colors' necropsy and her conclusions, as follows. The necropsy showed that Shining Colors' right forelimb had severe chronic conditions that had existed for a significant period, at least 10 days but more likely several weeks. (*Id.* ¶¶ 101-03.) Shining Colors' left forelimb had severe chronic laminitis resulting in kinking of its hoof and bone deformity, which would have been palpable and were not consistent with having occurred within the 24 hours before the horse was euthanized. (*Id.* ¶¶ 104-09, 113.) Shining Colors' necropsy stood out from the thousands Dr. Engiles had performed due to the severity and chronicity of the laminitis in the left forelimb and the inflammation in the right forelimb, which was active. (*Id.* ¶¶ 110-11.) In Dr. Engiles' professional opinion, based on the tissue samples, Shining Colors' cellulitis had been present for at least two weeks, probably three weeks, and maybe longer. (*Id.* ¶ 114.) Dr. Engiles believed it would be very unusual for the cellulitis infection to have existed without someone being aware of it or for a caretaker to be unaware of the rupture of Shining Colors' flexor tendon in its right forelimb, which would alter the way it walked. (*Id.* ¶¶ 116-18, 125.) Similarly, the condition of Shining Colors' left forelimb would have been visible on January 6, 2022, and noticeable upon palpation of the hoof, which should have occurred at least once a day. (*Id.* ¶¶ 123-24, 127-28.) "Anyone with a basic 4H training" looking at Shining Colors or performing routine hoof care during this period would have known it was injured because it would have been unable to walk properly due to pain on January 6 through January 9, 2022. (*Id.* ¶¶ 30, 119-21, 129, 131-32.) A horse in Shining Colors' condition should not have been shipped on January 6, 2022, and needed veterinary care on that day, as well as

on January 7, 8, and 9, 2022, which it did not receive. (*Id.* ¶¶ 130, 134-35.) Dr. Engiles opined that although Shining Colors needed the care of a veterinarian, it was not the veterinarian who was solely responsible for Shining Colors' wellbeing because others are involved in the care of a horse. (*Id.* ¶ 137.)

Dr. McAllister testified, consistent with his report, as follows. Based on his review of the redacted necropsy report and an investigative report, Shining Colors' cellulitis and laminitis were chronic and catastrophic, would have caused pain levels of 9 out of 10, and both would have been visible to any observer, respectively, three days and several days before its death. (*Id.* ¶¶ 150, 152-54, 157-58.) Shining Colors' laminitis should have been caught earlier than January 9, 2022, with routine hoof care, which requires a horse's hooves to be cleaned at least once a day. (*Id.* ¶¶ 159-61.) The problems likely existed for several weeks, if not months, prior to the horse's shipment from Belmont to Parx; Shining Colors would not have been able to walk properly on January 6, 2022, without medication and foot care; a professional groom or trainer would have realized there was a problem with Shining Colors and shipping the horse in its condition; and it was inappropriate and inhumane to ship Shining Colors on January 6, 2022. (*Id.* ¶¶ 14-16, 148, 165-69, 172-74.) It was likely that drugs had been administered to Shining Colors to sedate it for the trip. (*Id.* ¶ 17.)

Director Klouser testified as follows. A trainer of record for a horse is responsible for the care, custody, and control of the horse, as well as for those that work on the trainer's behalf with the horse. (*Id.* ¶¶ 178, 180.) As Shining Colors' trainer for the period in question, Petitioner was responsible for the horse's medical care. (*Id.* ¶ 179.) Although a person shipping a horse into a racetrack must report all horses in a trailer or turn over health certificates and medical cards, Director

8

Klouser's investigation did not reveal any such reporting or health certificates, including a CVI, in Parx records for Shining Colors, although a second horse that was in Petitioner's trailer with Shining Colors was registered. (*Id.* ¶¶ 181-84.) Director Klouser indicated it was not in racing's best interests for Petitioner to have engaged in the conduct alleged and such "conduct shines a bad light on the horse racing industry and undermines public confidence in the racing industry" because "[i]t is imperative that all trainers and licensees of the . . . Commission are providing proper care to horses." (*Id.* ¶¶ 185-86.)

Petitioner reiterated his testimony from the Stewards' hearing that Shining Colors was scratched from a race at Belmont on December 11, 2021, received treatment for a health issue from Dr. Perez at that time, Dr. Perez signed a CVI, upon which he relied, and Shining Colors was walking normally before being shipped from Belmont on January 6, 2022. (*Id.* ¶¶ 12-13; R.R. at 212a-13a, 222a-23a.) According to Petitioner, the decision to ship Shining Colors on January 6, 2022, was his, and it was so that he could keep an eye on the horse, he performed the shipment himself, and he did not stop anywhere. (FOF ¶¶ 18, 20, 23.) Petitioner asserted he handed over Shining Colors' medical paperwork, including the CVI, when he arrived at Parx, and Parx must have lost it. (R.R. at 214a-15a, 220a, 224a-25a.) Petitioner acknowledged he understood the standard of care for horse healthcare and that a horse's hooves should be examined every day. (FOF ¶¶ 26-27.) Petitioner is familiar with laminitis and cellulitis and that these conditions would cause a horse great pain. (*Id.* ¶¶ 188-91.) Petitioner did not obtain veterinary care for Shining Colors on January 6, 7, or 8, 2022. (*Id.* ¶¶ 192-94.)

Petitioner agreed that he believed this is a "big set up" because the New York stewards reviewed this matter and nothing came from it; however, those stewards

9

did not hold a hearing involving this fact pattern, and Petitioner did not produce any adjudication by those stewards. (*Id.* ¶¶ 210, 218, 223.) Petitioner did not produce the CVI at the Stewards' hearing, and he knew that such certificate would have to be given to Parx officials. (*Id.* ¶¶ 219-20.) The CVI he offered at the Commission's hearing was difficult to read and was indecipherable and admitted only to show the effect it had on Petitioner's state of mind, not for its truth. (*Id.* ¶¶ 225-26.) Although Petitioner stated his attorneys had Shining Colors' health records and that Dr. Perez cleared Shining Colors to travel, neither those records, nor Dr. Perez's testimony, were presented at the Commission's hearing. (*Id.* ¶¶ 222, 224.)

Petitioner's employees at the time of Shining Colors' death, Mr. Herrera and Ms. Nieves, testified that Shining Colors was walking fine between January 6 and 8, 2022, and that the standard of hoof care required a horse's hooves be examined every day. (*Id.* ¶¶ 214-16; R.R. at 200a-03a, 205a-07a.) Ms. Nieves agreed that she did not want to see anything bad happen to Petitioner. (FOF ¶ 217.)

Dr. Bertone testified that there could be alternative causes for Shining Colors' condition and alternative durations of those conditions, testifying that the horse could have been fine when it left Belmont on January 6, 2022, and developed the conditions or the conditions had worsened significantly by January 9, 2022. (*Id.* ¶ 199.) However, Dr. Bertone did not disqualify that the laminitis and cellulitis could have been present before Shining Colors' euthanasia and agreed with Dr. McAllister's pain assessment that Shining Colors' pain would have been a 9 out of 10. (*Id.* ¶¶ 200-01.) Although Dr. Bertone testified that it was possible for a coffin bone to rotate the way Shining Colors' did in three days, Dr. Baiman testified in rebuttal that this scenario could not happen in three days. (*Id.* ¶ 209.) Dr. Bertone

10

was told by Petitioner's counsel what was needed for the defense in this matter and received $3,500.00 for his testimony. (*Id.* ¶¶ 202-03.)

The Commission found the testimony of Director Klouser and Drs. Baiman, Engiles, and McAllister "persuasive, credibl[e] and trustworthy – in stark contrast to [Petitioner's] testimony." (Adjudication at 28, 32.) In contrast, the Commission found Mr. Herrera's and Ms. Nieves' testimony to be "at best biased and at least doubtful" and not adding anything to mitigate Petitioner's actions, citing their "financial interest in the outcome due to their being Petitioner's employees," the possibility that Shining Colors had been heavily medicated, and that neither testified they actually inspected Shining Colors' hooves, which would have revealed the coffin bone one millimeter away from poking through its skin. (*Id.* at 33.) The Commission expressly rejected Dr. Bertone's testimony, noting it "was based upon speculation and facts not in evidence," "did not directly contradict" the testimony of Drs. Baiman, Engiles, and McAllister, and was not the result of his examination of the horse or a blind review of its autopsy. (*Id.* at 33-34 & Conclusion of Law (COL) ¶ 20.) The Commission rejected Petitioner's testimony as self-serving, incongruous, and not credible based on, among other things, its conflict with the testimony of Drs. Baiman, Engiles, and McAllister, and the fact that Shining Colors' medical records were never introduced, notwithstanding that they were allegedly in the possession of Petitioner's counsel. (*Id.* at 34-35.) Similarly, noting that, as fact finder, it was entitled "to draw 'inferences from the established facts and circumstances,'" the Commission concluded Petitioner's failure to offer Dr. Perez's testimony at any proceedings, despite his reliance on that veterinarian's professional opinion, "suspicious and most troubling." (*Id.* at 29, 35 (quoting *Pa. Lab. Rels. Bd. v. Kaufmann Dep't Stores, Inc.*, 29 A.2d 90, 92 (Pa. 1942)).) Finding the CVI proffered

11

"indecipherable and questionable," the Commission was left to "speculate why [Petitioner] did not ask Dr. Perez to testify" and drew an adverse inference "that Dr. Perez's testimony would not have supported [Petitioner's] testimony or exonerated him." (*Id.*)

Based on the credited evidence, the Commission specifically concluded:

5. The evidentiary record establishes that [Petitioner], as trainer of record, was responsible for the care, custody, condition, fitness, health and safety of Shining Colors. 7 Pa. Code § 303.15(5) . . . .

6. On January 6, 202[2], [Petitioner] transported the horse Shining Colors from Belmont [] to Par[x] when he knew or should have known that Shining Colors was suffering from severe, painful health conditions in each of [its] forelimbs. . . .

7. Shipping Shining Colors into Parx on January 6, 2022, in the condition [it] was in was inhumane, cruel, grossly negligent, inappropriate and unethical. . . .

8. [Petitioner] failed to obtain needed veterinary care for Shining Colors as required on January 6, 2022, and on January 7, 2022, and on January 8, 2022. . . .

9. [Petitioner's] actions were not in the best interests of racing, and undermine the general public's faith, perception of and confidence in the racing industry. . . .

. . . .

15. The evidence and testimony of record ha[ve] proven beyond a preponderance of the evidence that [Petitioner] subjected or permitted an animal under his care, custody, control or supervision to be subjected to or incur[] any form of cruelty, mistreatment, neglect, abuse or abandonment. [Petitioner] caused a horse under his care to be injured, maimed, killed, or otherwise deprived an animal of necessary veterinary care. 7 Pa. Code § 185.7[(b)]. . . .

16. The evidence and testimony of record ha[ve] proven beyond a preponderance of the evidence that [Petitioner] engaged in

12

inappropriate, illegal or unethical conduct which violates the Commission's rules and regulations of racing, is inconsistent with the best interests and integrity of racing or otherwise undermines the general public's faith, public perception and confidence in the racing industry. 7 Pa. Code 185.2. . . .

17. The evidence and testimony of record ha[ve] proven beyond a preponderance of the evidence that [Petitioner] permitted an animal under his control to be subjected to a form of cruelty, mistreatment, neglect, abuse or abandonment, or that he injured, maimed, killed, or administered a noxious or harmful substance to or deprived an animal of necessary care, sustenance, shelter or veterinary care. 7 Pa. Code § 401.62. . . .

18. The evidence and testimony of record ha[ve] proven beyond a preponderance of the evidence that [Petitioner] did not adequately ensure the care, custody, condition, fitness, health, safety and security of a horse under his control. 7 Pa. Code § 303.15(5). . . .

(*Id.* ¶¶ 5-9, 15-18.)

Accordingly, the Commission held the evidence supported the Stewards' findings that Petitioner's actions violated Sections 185.2, 185.7(b), 303.15(5), and 401.62 of the Regulations. (*Id.* ¶¶ 10-14.) It observed that "there is no more important regulatory function than to ensure that all racing participants treat horses with care, compassion and respect" and, "[u]nfortunately, . . . the matter before [the Commission was] a sad example of a horse not being properly protected, cared for and treated with respect," which "culminat[ed] in the horse's death." (Adjudication at 26.) The Commission held "[t]he overwhelming evidence reflects that on or about January 6, 2022, [Petitioner] shipped a sick, ailing, and lame horse, named 'Shining Colors,' from New York state to Parx [] in Bensalem, Pennsylvania." (*Id.* at 29.) Shining Colors "had severe laminitis in its left forelimb, severe cellulitis in its right forelimb and could not walk properly," its "[l]esions would have been visible," and "the horse would have been in excruciating pain." (*Id.* at 29-30.) Still, no veterinary

13

care was sought for Shining Colors until January 9, 2022, at which point its condition required it to be euthanized. (*Id.* at 30-31.) The Commission found that Petitioner's "conduct str[uck] at the very heart of racing," and noted Petitioner's disciplinary history, which included 91 disciplinary rulings. (*Id.* at 32, FOF ¶¶ 7, 9.) The Commission concluded Petitioner did not present more than a "mere scintilla" of evidence to support his position that the penalty was too harsh and "[a] gross reduction of penalty is not warranted here." (*Id.* at 2 n.2, 36, FOF ¶¶ 7, 9 & COL ¶ 19.) Petitioner now petitions this Court for review.

## II.    DISCUSSION

### A. *Parties' Arguments*

Petitioner argues the Commission's determination that he failed to show that the Stewards' decision was improper is erroneous because there was no evidence that Petitioner knowingly acted in this matter. Citing his own testimony, and that of Mr. Herrera and Ms. Nieves, "the actual people caring for" and "the only three people to see [Shining Colors] in person before the unfortunate ending," and the testimony of Dr. Bertone, an expert on laminitis, Petitioner maintains Shining Colors was fine until January 9, 2022, even if the horse was in the advanced stages of laminitis. (Petitioner's Br. at 8-9.) According to Petitioner, Mr. Herrera's and Ms. Nieves' testimony should not have been discounted merely because they were former employees, and Dr. Bertone's testimony was that of the only expert in laminitis. Petitioner challenges the testimony of Drs. Baiman, Engiles, and McAllister as being insufficient for a variety of reasons, including that they are not experts on laminitis, did not review Shining Colors' veterinary records from New York, and could not have first-hand knowledge of the horse's condition on January 6, 2022. (Petitioner's Br. at 5-7.) Petitioner also challenges Director Klouser's

14

testimony because Director Klouser did not contact anyone in New York during his investigation and sought to impose strict liability on Petitioner rather than on Dr. Perez, whom Petitioner employed to provide veterinary care to Shining Colors. (*Id.* at 7.) Petitioner maintains the Commission should have investigated what happened in New York prior to Shining Colors' shipment to Parx and, having not done so, the evidence is not sufficient to uphold the Stewards' Decision, which was contrary to the decision reached by the New York stewards.

The Commission argues its findings of fact are supported by substantial evidence, specifically, the credited testimony of Director Klouser and Drs. Baiman, Engiles, and McAllister, and those findings support the Commission's conclusions that Petitioner's actions violated the Regulations. The Commission maintains that Petitioner's arguments challenge the Commission's credibility determinations and assert that all of the evidence had to be interpreted in favor of the party that prevailed below, which was not Petitioner. The Commission argues that its evidentiary determinations, such as the resolution of evidentiary conflicts and witness credibility, are not subject to review, and the evidence must be viewed, along with all reasonable inferences deducible therefrom, in the light most favorable to the prevailing party, which was not Petitioner. *Boyce v. Pa. State Horse Racing Comm'n*, 651 A.2d 656, 659 (Pa. Cmwlth. 1994). The Commission reiterates the reasoning for rejecting Petitioner's evidence, including the illegible CVI purportedly completed by Dr. Perez prior to Shining Colors' shipment to Parx, set forth in the Adjudication. According to the Commission, Petitioner "is not entitled to relief on his *post hoc* reframing of the facts," and, therefore, the Adjudication should be affirmed. (Commissioner's Br. at 46.)

15

*B. Analysis*

"Our scope of review is limited to a determination of whether constitutional rights have been violated, an error of law was committed[,] or necessary findings of fact are supported by substantial evidence." *Niefart v. State Horse Racing Comm'n*, 567 A.2d 789, 791 (Pa. Cmwlth. 1989). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Pinero v. Pa. State Horse Racing Comm'n*, 804 A.2d 131, 136 (Pa. Cmwlth. 2002) (citation omitted). "[Q]uestions of evidentiary weight and [the] resolution of evidentiary conflicts are for the Commission, not the reviewing court." *Boyce*, 651 A.2d at 660.

The overriding purpose of the Race Horse Industry Reform Act[3] (Act) and accompanying Regulations is "to foster an image of horse racing that would make the image of that 'industry' an irreproachable one, even in the eyes of the skeptical public." *Helad Farms v. Pa. State Harness Racing Comm'n*, 470 A.2d 181, 184 (Pa. Cmwlth. 1984). "To that end, the Commission must discourage conduct that undermines public confidence and respect in the sport." *Kulick v. Pa. State Horse Racing Comm'n*, 540 A.2d 620, 623 (Pa. Cmwlth. 1988) (citing *Daly v. Pa. State Horse Racing Comm'n*, 391 A.2d 1134 (Pa. Cmwlth. 1978)). The conduct resulting in sanction does not need to "be criminal in nature nor proved beyond a reasonable doubt." *Id.* Rather, the preponderance of the evidence standard applies in administrative hearings, *Samuel J. Lansberry, Inc. v. Pennsylvania Public Utility Commission*, 578 A.2d 600, 602 (Pa. Cmwlth. 1990), which is a "more likely than not standard," *Commonwealth v. McJett*, 811 A.2d 104, 110 (Pa. Cmwlth. 2002). "It is sufficient that the complained-of conduct and its attending circumstances be such as to reflect negatively on the sport." *Kulick*, 540 A.2d at 623.

---

[3] 3 Pa.C.S. §§ 9301-9374.

Petitioner first argues the Commission's Adjudication is not supported by substantial evidence. Upon our review of the record, we disagree. Here, Drs. Baiman, Engiles, and McAllister all credibly opined, based on their professional experience, that Shining Colors' laminitis and cellulitis conditions: were severe; caused pain and/or lameness; were chronic and had been present at the time of the horse's shipment from Belmont on January 6, 2022, if not weeks before; would have been visible or discernable to anyone familiar with horses and performing a daily hoof inspection, as is the standard of care, on January 6, 2022; and would have made shipping Shining Colors on that date inhumane and/or grossly negligent. (R.R. at 63a-64a, 66a, 69a, 72a-74a, 95a-96a, 105a-17a, 119a, 127a-28a, 135a-40a, 142a-43a, 146a-50a, 161a, 163a.) Although Dr. Bertone offered alternative theories to explain Shining Colors' condition and its rapid worsening, which were rejected as not credible, Dr. Bertone did not discount the opinions of the other expert veterinarians and agreed with Dr. McAllister's assessment that Shining Colors' pain would have been 9 out of 10. (*Id.* at 239a, 258a.) Petitioner acknowledged he was aware cellulitis and laminitis would cause a horse great pain and it was his decision to ship Shining Colors from Belmont to Parx on January 6, 2022. (*Id.* at 221a-22a, 225a-26a.) A reasonable mind viewing this evidence, and the inferences reasonably deducible therefrom, in the light most favorable to the prevailing party, "might accept [it] as adequate to support" the findings of fact the Commission relied upon to uphold the Adjudication. *Pinero*, 804 A.2d at 136.

While Petitioner challenges the Commission's evidentiary determinations, asserting his evidence should have been credited, the resolution of evidentiary conflicts is for the Commission, not this Court. *Boyce*, 651 A.2d at 660. Further, to the extent Petitioner maintains the opinions of Drs. Baiman, Engiles, and McAllister

17

were speculative as to what occurred in New York immediately before and on January 6, 2022, circumstantial evidence may constitute substantial evidence to support a factual conclusion if "the evidence [is] adequate to establish the conclusion sought and must so preponderate in favor of the factual conclusion as to outweigh . . . any other evidence and reasonable inferences therefrom which are inconsistent therewith." *Monaci v. State Horse Racing Comm'n*, 717 A.2d 612, 618 (Pa. Cmwlth. 1998) (citation omitted). On this record, we discern no error in the Commission's conclusion that the opinions of Drs. Baiman, Engiles, and McAllister, which were based on many years, if not decades, of experience, outweighed the other evidence and reasonable inferences of the other evidence offered, particularly where Petitioner's own expert did not discount those opinions.

Those findings of fact, in turn, support the conclusions that it was more likely than not, *McJett*, 811 A.2d at 110, that Petitioner violated Sections 185.2, 185.7(b), 303.15(5), and 401.62 of the Regulations by shipping Shining Colors on January 6, 2022. Section 185.7(b) relevantly provides that "[n]o licensee . . . shall subject or permit any animal under the licensee's care, custody, control or supervision to be subjected to or to incur any form of cruelty . . . [or] neglect . . . [or] deprive any animal of necessary veterinary care." 7 Pa. Code § 185.7(b). Similarly, Section 401.62 of the Regulations relevantly states "[a] licensee . . . may not . . . permit an animal under [the licensee's] control to be subjected to a form of cruelty, mistreatment, neglect . . . , or . . . deprive an animal of necessary care . . . [or] veterinary care. 7 Pa. Code § 401.62. The Commission's findings, which are based on substantial evidence, support the conclusions that, more likely than not, Petitioner subjected Shining Colors, a horse within his care, custody, control, and supervision, to a form of cruelty, neglect, and/or mistreatment, as well as deprived the horse of

18

veterinary care, when he shipped the horse from Belmont to Parx on January 6, 2022, in violation of these provisions.

Section 303.15(5) provides that it is a trainer's responsibility to "[e]nsur[e] the adequate care, . . . condition, health, [and] safety . . . of horses under his/her care, custody, and control[.]" 7 Pa. Code § 303.15(5). The Commission's supported findings also support the conclusion that, more likely than not, Petitioner did not "[e]nsur[e] the adequate care, condition, health, [and] safety" of Shining Colors when he shipped the horse from Belmont to Parx on January 6, 2022, in violation of this provision.

Finally, Section 185.2 of the Regulations provides:

> [a] licensee shall not . . . engage in inappropriate . . . [or] unethical conduct which violates the Commission's . . . regulations . . . , is inconsistent with the best interests and integrity of racing or otherwise undermines the general public's faith, public perception and confidence in the racing industry.

7 Pa. Code § 185.2. The Commission's findings support its conclusions that, more likely than not, Petitioner engaged in inappropriate or unethical conduct that violated the Commission's Regulations, as stated above. Further, those findings support the Commission's conclusion that, given the focus of the Regulations on ensuring the wellbeing of the horses involved in racing, it was more likely than not that Petitioner's conduct "jeopardize[d] the sport of horse racing," "sen[t] a terrible message to the public, to the licensees, and to caring, diligent people everywhere," and "were not in the best interests of racing, and undermine[d] the general public's faith, perception of and confidence in the racing industry." (Adjudication at 36, COL ¶ 9.) Accordingly, we discern no error in the Commission's conclusions that Petitioner's conduct violated multiple sections of its Regulations.

19

Petitioner also argues that the Commission erred by applying a "strict liability" standard and by not requiring that it be proven that he acted "knowingly." (Petitioner's Br. at 5.) However, neither argument has merit. In *Commonwealth v. Webb*, 274 A.2d 261 (Pa. Cmwlth. 1971), the case Petitioner cites in support of his positions, a trainer argued the Commission was imposing strict liability, rendering him an insurer of a horse's condition regardless of the trainer's actions, when it upheld the suspension of his license arising from a positive drug result of a horse he trained. We rejected that argument, distinguishing the Commission's then-regulations, which were similar to the current Regulations, from those of other states that imposed absolute liability on trainers or declared trainers the absolute insurer of a horse. *Id.* at 265-67. We noted that, unlike those other states' laws, Pennsylvania's regulations "clearly provide ample opportunity for an embattled trainer to demonstrate his innocence and likewise clearly provide that a penalty is not automatically imposed." *Id.* Those regulations provide a trainer notice, the right to counsel, the right to a hearing before the stewards, and, if necessary, before the Commission, thereby giving licensees the "opportunity to be fully heard and to be fairly adjudged before a penalty, if any, would be imposed." *Id.* Further, Petitioner's contention that it had to be proven that he acted "knowingly," (Petitioner's Br. at 5), is not supported by the language of the Regulations or precedent. *Luzzi v. State Horse Racing Comm'n*, 548 A.2d 659, 668-69 (Pa. Cmwlth. 1988) (holding the Commission's Regulations are not criminal statutes and "court[s] will not require knowledge where an administrative regulation does not specifically require it"); *Marusco v. Pa. State Harness Racing Comm'n*, 448 A.2d 662, 664 (Pa. Cmwlth. 1982) (rejecting a trainer's argument that his license could not be suspended based on his failure to guard his horse, which was then found to have drugs in its system,

20

because there was no proof that he knew the horse had been drugged). Thus, these are not reasons to reverse the Commission's Adjudication.

Finally, Petitioner argues the penalty imposed is too severe and is not consistent with the New York stewards' decision. We discern no error or abuse of discretion in the penalty imposed. In upholding the suspension of Petitioner's licenses for the remainder of their terms, the Commission relied not only on the evidence related to Shining Colors' shipment and death, but also Petitioner's history of disciplinary actions, which reflected almost 100 violations. A reasonable mind reviewing that evidence in the light most favorable to the party prevailing before the Commission might accept it to support the penalties imposed. Although Petitioner relies on the lack of action by the New York stewards, there is no indication those stewards had the same evidence before them when they made their decision (or even held a hearing). Accordingly, this is not a reason to reverse the Commission's Adjudication, which is supported by substantial evidence and precedent.

## III.   CONCLUSION

Because the Commission's findings of fact are supported by substantial evidence, and those findings support the conclusion that Petitioner's actions as they relate to his shipping Shining Colors from Belmont to Parx violated numerous Commission Regulations, we affirm.

_____
**RENÉE COHN JUBELIRER,** President Judge

21

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Juan Vazquez, :
                 Petitioner :
                           :
                v. : No. 1169 C.D. 2022
                           :
Pennsylvania State Horse :
Racing Commission, :
              Respondent :

## O R D E R

**NOW**, June 29, 2023, the Order of the Pennsylvania State Horse Racing Commission, entered in the above-captioned matter, is hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** President Judge